In re the **LESLIE FAY COMPANIES, INC. SECURITIES LITIGATION.**

**This Document Relates To All Actions.**

**Master File No. 92 Civ. 8036 (WCC).**

United States District Court, S.D. New York.

May 26, 1995.

Weil, Gotshal & Manges, New York City, for Ralph Destino, Ira J. Hechler and Michael L. Tarnopol (The Audit Committee of the Board of Directors of the Leslie Fay Companies, Inc.) (Dennis J. Block, of counsel).

Proskauer Rose Goetz & Mendelsohn, New York City, for defendant BDO Seidman (Leon P. Gold, of counsel).

Lord, Bissell & Brook, Chicago, IL, for the Official Committee of Equity Security Holders of The Leslie Fay Companies, Inc. (Benjamin Waisbren, of counsel).

### OPINON AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This discovery dispute comprises yet another chapter in the ongoing class action brought on behalf of all individuals who purchased common stock of The Leslie Fay Companies, Inc. ("Leslie Fay" or "the Company") between March 28, 1991 and April 5, 1993. Plaintiffs allege violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder against a number of Leslie Fay's former officers and directors (collectively the "Individual Defendants") and BDO Seidman ("BDO"), the Company's former outside auditor. In April 1995, BDO filed various cross-claims against the Individual Defendants and a third party complaint against certain of Leslie Fay's directors seeking contribution for any liability BDO may ultimately bear in the underlying action.

On December 22, 1993, this Court ordered production of a report (the "Audit Committee Report" or "ACR") generated by Leslie Fay's Board of Directors' Audit Committee (the "Audit Committee" or the "Committee"). BDO now seeks production of documents created by Weil, Gotshal & Manges ("Weil"), attorneys representing the Audit Committee, and by Arthur Andersen & Co. ("AA") for Weil in connection with the investigation conducted by the Audit Committee in preparing the ACR. For the reasons discussed below, the Court orders Weil to produce these documents unless it can show, on a document-by-document basis, that any documents withheld contain the attorneys' legal analysis or advice not discussed in the ACR, and do not encompass subject matters reflected in the ACR.

### I. BACKGROUND

Although the facts surrounding the creation of the ACR are fully articulated in our prior opinion, *see In re Leslie Fay Companies, Inc. Securities Lit.*, 152 F.R.D. 42 (S.D.N.Y.1993) [hereinafter *Leslie Fay I* ] familiarity with which is presumed, we will briefly recapitulate the events leading up to this discovery dispute. On January 31, 1993, the Board of Directors of Leslie Fay (the "Board") was informed of certain accounting irregularities with respect to the Company's financial statements. Subsequently, the Board requested its Audit Committee to commence an investigation and report its findings to the Board. The Audit Committee retained Weil to assist in the investigation, who in turn retained a team of AA accountants (the "AA Investigation Team").[1] The instant discovery dispute involves the discoverability of the documents created in the course of that investigation.

On February 1, 1993, Leslie Fay publicly announced the commencement of this Audit Committee Investigation and stated that the results might cause the Company to restate previously reported earnings for 1991 and eliminate any profit for 1992. On the same day, the first of thirteen shareholder class-

---

**1.** This AA team is not to be confused with a second group of AA auditors (the "AA Audit Team" or the "Audit Team") whom the Company hired to replace BDO after BDO resigned as the Company's independent auditor in May 1994.

action lawsuits was filed against the Company,[2] its officers and directors, and BDO.

Shortly thereafter, Leslie Fay was informed by the Securities & Exchange Commission (the "SEC"), the United States Attorney's Office for the Middle District of Pennsylvania (the "USAO/MDPA"), and the United States Attorney's Office for the Southern District of New York ("USAO/SDNY") that they had commenced investigations into the accounting irregularities. At the outset of these government investigations, the Audit Committee agreed to provide the SEC and the U.S. Attorneys with copies of the ACR upon completion of the investigation.

On September 29, 1993, Leslie Fay issued a press release announcing the completion of the ACR, after which it voluntarily provided copies of the report to the SEC, USAO/MDPA, and USAO/SDNY. Upon BDO's motion to compel production of the report in this suit, we ruled in December 1993 that the production of the report to the SEC waived any work-product immunity, attorney-client privilege, or self-analysis privilege associated with the report itself. *Leslie Fay I,* 152 F.R.D. at 44.

Subsequent to the ACR's creation, in Leslie Fay's pending chapter 11 bankruptcy proceeding, a committee of Leslie Fay's creditors (the "Creditors' Committee") questioned Weil's impartiality and the accuracy of the report. Therefore, at Weil's request the bankruptcy court appointed Examiner Charles A. Stillman ("Stillman") to investigate these assertions. In accordance with that order, Stillman obtained a large portion of Weil's and AA's work product generated in preparing the ACR and deposed several Weil attorneys. That order also maintained the confidentiality of the documents produced by the Audit Committee pursuant to Stillman's

investigation and indicated that their production did not affect any work-product or attorney-client immunities potentially covering them. On May 27, 1994, Stillman filed two reports (the "Stillman Reports") with the bankruptcy court analyzing 1) the potential claims on behalf of the bankruptcy estate[3] and 2) Weil's potential conflict of interest in representing the Audit Committee and preparing the ACR. Those reports substantially concurred with the conclusions of the ACR that senior management was not culpable for failing to detect the accounting irregularities. Although initially filed under seal, the Stillman reports were unsealed in August 1994 in response to a motion brought by Bloomberg Business News. Similarly, although the ACR was initially subject to the terms of a confidentiality agreement between the parties in the instant suit "So Ordered" by this Court, pursuant to our order dated March 31, 1995, we declared that document nonconfidential.

Pursuant to the USAO/MDPA's investigation, in addition to providing the ACR, Leslie Fay also produced certain materials prepared by AA at the direction of Weil in connection with the Audit Committee's investigation in response to grand jury subpoenas. In a letter dated November 17, 1993, the U.S. attorney agreed to keep the ACR confidential and disclosure limited to the furtherance of law enforcement objectives. Similarly, the AA materials were produced in accordance with a confidentiality agreement between the USAO and Weil dated May 19, 1994. In that letter agreement, the parties state that the production is made pursuant to the "common interests of the USAO and the Audit Committee" and is not meant to waive any attorney-client privilege or work-product protection to which those documents may be entitled. Referring to the November 17 agreement, the U.S. Attorney also agreed to

---

**2.** On April 5, 1993, Leslie Fay filed a voluntary petition for protection under the bankruptcy laws, and pursuant to the automatic stay provisions of the Bankruptcy Code, all litigation against the Company was stayed. Leslie Fay was then dropped as a named defendant in this suit.

**3.** Based on that report, the Official Committee of Equity Security Holders of the Leslie Fay Companies, Inc. (the "Equity Committee") instituted

an adversary proceeding against BDO in the bankruptcy court on April 4, 1995 for breach of contract, breach of warranty, professional negligence, and negligent misrepresentation. After plaintiff moved to withdraw the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d), that claim is now pending before this Court. *The Leslie Fay Cos. v. BDO Seidman,* No. 95–3340 (S.D.N.Y. assigned to Conner, J. May 17, 1995).

keep the AA materials confidential and disclosure limited to the furtherance of law enforcement objectives.

On March 15, 1995, BDO served a subpoena on Weil pursuant to Rule 45, Fed.R.Civ. Pro., to produce, among other things the following four classes of documents in Weil's possession:

1) memorandum and notes regarding interviews of Company personnel conducted by Weil and AA in the course of preparing the ACR;

2) Weil and AA work product relating to the discovery, mechanics and scope of Leslie Fay's accounting irregularities;

3) Weil and AA work product relating to the other matters discussed in the ACR, including their analysis of materials reviewed by senior management and the outside directors; and

4) communications with the Audit Committee about the investigation, including drafts of the ACR.[4]

Having failed to secure Weil's compliance with the subpoena, BDO wrote a letter to the Court on April 18, 1995, asking us to schedule a pre-motion conference to address Weil's refusals to comply with BDO's document requests. After holding a conference on April 19, the Court directed the parties to brief their respective positions in letters to the Court.

In its April 18 and May 1 letters, BDO asserts that none of the classes of documents at issue are protected from discovery by either the work-product doctrine or the attorney-client privilege for three reasons. First, BDO contends that the documents were prepared for business purposes, not in anticipation of litigation, and are therefore not shielded from discovery by the work-product doctrine. Second, BDO argues that even if generated in anticipation of litigation, Weil has waived any work-product protection and/or attorney-client privilege associated with the documents by producing the them and/or revealing their contents to Stillman and the Creditors' Committee, the SEC, and the USAO/MDPA. Moreover, BDO con-

tends that by publicly disclosing the results of the Audit Committee investigation, and in light of the Court's order declaring the ACR non-confidential, Weil should be required to produce Company financial statements and other factual documents on which the ACR is based. Finally, BDO asserts that the "crime-fraud" doctrine abrogates any work-product immunity or attorney-client privilege covering the documents. Pointing to the arguably strained conclusion of the ACR that Leslie Fay's upper management was not involved in fraudulently altering the Company's financial statements, BDO contends that Weil intentionally altered the report to exonerate management. Therefore, BDO asserts that Weil is a participant in the fraud and its documents prepared in furtherance of the fraud should not be afforded court protection. We will address each of these arguments below.

## II. ATTORNEY WORK PRODUCT

 The work-product doctrine is a judicially created immunity to prevent a party to a lawsuit from receiving the benefits of an opposing counsel's preparations for trial. *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947). Although its protection extends to all documents prepared in anticipation of litigation, "[a]t its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). Therefore, while factual materials falling within the scope of the doctrine may generally be discovered upon a showing of "substantial need," attorney mental impressions are more rigorously protected from discovery unless the doctrine's protection is otherwise waived. *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); Fed.R.Civ.Pro. 26(b)(3) ("... the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney....").

---

4. BDO had initially requested that the Court also order the production of communications with government agencies, including the Securities and Exchange Commission (the "SEC") and U.S. Attorney's Offices, about the investigation and the ACR but have since withdrawn that request.

■ As a threshold matter, the party seeking to hide behind the work-product shield must establish that the documents at issue were prepared in anticipation of litigation. *Matter of Grand Jury Subpoenas,* 959 F.2d 1158, 1166 (2d Cir.1992). While the "in anticipation of litigation" requirement does not limit protection to documents prepared in the course of an ongoing litigation against the specific party attacking the invocation of the doctrine, the documents must have been prepared at least with "an eye toward litigation." *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 47 F.R.D. 334, 337 (S.D.N.Y.1969).

For instance, in *Stix* the defendant patent owner sought discovery of an attorney opinion secured by a third-party witness regarding the validity of the patent at issue. Although when the opinion was prepared the witness was not a party to any infringement action, this Court found that litigation was a very real possibility and that the opinion was prepared primarily in its anticipation. *Id.*

■ The "in anticipation" requirement can properly be divided into two subcomponents: causation and reasonableness. Causation requires that the documents be prepared *because* of the impending litigation. *Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 660 (S.D.Ind.1991) ("material must have been produced *because of* [the] prospect [of litigation] and for no other purpose."). *See also,* Rule 26(b)(3), Fed.R.Civ.Pro. advisory committee note ("Materials assembled ... for other nonlitigation purposes are not under the qualified immunity provided by this subdivision."). Reasonableness, on the other hand, explores the temporal limits of the doctrine's application based on the circumstances surrounding the case. Professors Wright and Miller explain the interplay between these two elements:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

8 Charles A. Wright et al., Federal Practice and Procedure § 2024 (2d ed. 1994). As this passage indicates, both elements of the "in anticipation" requirement involve factual issues tied to the circumstances surrounding the creation of the documents in question.

■ In the instant case, the simple fact that the Company foresaw securities fraud litigation or that the SEC had initiated its own investigation prior to the Audit Committee's investigatory efforts does not automatically qualify the Audit Committee's investigation materials as work product. As the Seventh Circuit stated in *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.,* 709 F.2d 1109, 1119 (7th Cir.1983), a widely-recognized authority on the work-product doctrine:

> The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigatory report is producible in civil pre-trial discovery.... The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in-house' report as work product....

[citations omitted]. While we agree with Weil that once the accounting irregularities were publicly disclosed by the Company, litigation against and on behalf of Leslie Fay could be reasonably anticipated, Weil has not made a sufficient showing that the ACR was prepared and the internal investigation conducted *because of* the prospect of that litigation. Instead, we find that the Audit Committee, Weil, and AA conducted the internal investigation primarily for business reasons. Therefore, the ancillary existence of ongoing litigation does not shield their investigatory documentation from discovery.

Specifically, the Audit Committee used the investigation and subsequent report to make decisions on firing responsible personnel, to

determine the magnitude of the fraud and implement new financial structure, organization, reporting, and internal control systems, and, possibly most important, to reassure creditors and future lenders that the culpable parties and suspect internal policies were being vigorously sought and rooted out. As Leslie Fay announced on February 1, 1993, shortly after the fraud first came to light:

> ... it had requested its Audit Committee to commence an investigation into alleged accounting irregularities that, if true, could result in a restatement of its 1992 earnings and the elimination of any profit for 1992.

In a February 3, 1993 *New York Times* article, John Pomerantz, then the Company's CEO, was quoted as having said that he had met with the Company's lenders to give them an update on the Audit Committee's investigation. Similarly, on February 26, 1993, Leslie Fay issued another press release indicating a preliminary correction to its overstated financial data. The release quoted Pomerantz as stating that the disclosure was made "because of our desire to relieve some of the concern expressed by our lenders, our trade creditors, our customers, and our shareholders about our financial results and the outcome of the investigation." Moreover, as the *New York Times* reported on September 28, 1993,

> People close to the company said yesterday that the report ... was delayed in part by the company's efforts to make sure it did not imply that senior executives were responsible for the scandal....

A day later the Company issued another press release indicating that:

> The Audit Committee concluded that there is no evidence that any current member of the Board of Directors knew of or participated in the perpetration of the accounting irregularities.

In addition, the Audit Committee announced that it had made specific recommendations to senior management relating to the Company's financial structure, organization, financial reporting, and internal control systems, which were being implemented. Finally, it announced that in light of the investigation the Board had fired Paul Polishan, the Com-

pany's CFO, and Donald Kenia, a midlevel corporate controller, "for cause."

In light of these statements, we think that a finding that the internal Audit Committee investigation was not conducted *primarily* in anticipation of litigation more nearly comports with the realities surrounding the investigation. *See SEC v. Thrasher*, No. 92 Civ. 6987, 1995 WL 46681, at *3 (S.D.N.Y. 1995) (citing *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 304 (S.D.N.Y.1991)) (work-product applies "only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation."). As the evidence seems to indicate, had there been no ongoing or anticipated litigation, Leslie Fay would have conducted an investigation anyway. *See Stout v. Illinois Farmers Ins. Co.*, 150 F.R.D. 594, 604 (S.D.Ind.1993), *aff'd*, 852 F.Supp. 704 (S.D.Ind.1994) (if document would have been created for non-litigation uses regardless of intended use in litigation preparation, it should not be afforded work-product protection). While admittedly potential legal liability played a part in the investigation's undertaking, significant other factors were clearly present. These factors prevent us from concluding that the investigatory documents are attorney work product.

■ Moreover, we must emphasize that Weil bears the burden of proving that the Audit Committee conducted the investigation primarily in anticipation of litigation. *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 473 (S.D.N.Y.1993). While Weil vehemently argues that the investigation played no part in the official restatement of the financial data conducted by the independent AA Audit Team, Weil does not deny the other non-litigation uses contemplated by the investigation as discussed above.

Finally, Weil argues that in our December 23, 1994 ruling, determining that the Company had waived any work-product protection attending the ACR, we concluded that the report was covered by the doctrine. It argues, therefore, that since the ACR is work product, so are the underlying documents on which it is based. We wish to make clear that we have never ruled that the ACR is work product. While at the time we indicated that we felt it may be covered by the

doctrine, we specifically declined to address that question because we found that the Company had waived any protection surrounding the report. *Leslie Fay I*, 152 F.R.D. at 44 ("[T]he Court finds it unnecessary to reach this decision [that the ACR constitutes work product] because we find that the Audit Committee waived any work product immunity it may have had when it voluntarily disclosed the Report to the SEC without first obtaining a confidentiality agreement."). Having now addressed the applicability of the doctrine in the first instance, we agree with BDO that the ACR and the documents on which it was based were not prepared primarily in anticipation of litigation, and, hence, do not compose attorney work product.

## III. ATTORNEY–CLIENT PRIVILEGE

That determination does not end our inquiry, however. Because assumedly many of the documents contain communications between Weil and the Audit Committee or the Company, even if not prepared in anticipation of litigation, their discovery may be foreclosed under the attorney-client privilege. We must therefore address the applicability of that doctrine.

■■■■ The attorney-client privilege protects communications between an attorney and a client, made in confidence, for the purpose of obtaining legal advice or services from the attorney. This privilege, designed to facilitate openness and full disclosure between the attorney and the client, shields from discovery advice given by the attorney to the client as well communications from the client to the attorney. *See Upjohn Co v. United States*, 449 U.S. at 389, 390, 101 S.Ct. at 682, 683. The privilege can be properly invoked:

(1) where legal advice of any kind is sought (2) from a professional legal advisor in is capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protect (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived....

*In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984) (citing *United States v. Bein*, 728 F.2d 107, 112 (2d Cir.1984)). However, the privilege attaches only when a client seeks legal advice or services, as opposed to business advice. *Id.* at 1037.

■■■■ As alluded to above, the client can waive this immunity by otherwise disclosing the privileged communications. Indeed, "it has been established law for a hundred years that when the client waives the privilege by testifying about what transpired between her and her attorney, she cannot thereafter insist that the mouth of the attorney be shut." *In re von Bulow*, 828 F.2d 94, 101 (2d Cir.1987) (citing *Hunt v. Blackburn*, 128 U.S. 464, 470–71, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). Such a waiver can occur when the client or her attorney, with the consent of the client, voluntarily produces a purportedly privileged document to a third party. *Eigenheim Bank v. Halpern*, 598 F.Supp. 988, 991 (S.D.N.Y.1984). Moreover, in some circumstances, the production can waive the privilege not only with respect to the disclosed document but also as to all other communications made about the same subject between the attorney and the client. *von Bulow*, 828 F.2d at 103. Based principally on notions of fairness, courts have imposed such a "subject matter waiver" most often when the privilege-holder has attempted to use the privilege as both "a sword" and "a shield" or when the party attacking the privilege will be prejudiced at trial. *Id.*

In the instant case, based on the parties' representations to the Court regarding the documents' contents, we find that the documents at issue, absent a waiver, are probably covered by the privilege. While we previously determined that the documents were not prepared primarily in anticipation of litigation, we find no basis for concluding that they were not prepared by Weil or for Weil by AA in the course of offering legal advice, as opposed to business advice, to the Audit Committee. Moreover, the documents also most probably reflect communications between Weil and the Company made pursuant to Weil's legal representation of the Audit Committee. The interview notes memorialize communications from the Company to Weil and the other documents underlying the

ACR, including the ACR drafts, contain explicit as well as implicit legal advice from Weil to the Audit Committee about the source and extent of the accounting irregularities. Since BDO contends only that the Audit Committee has waived any privilege covering these documents, we will assume for purposes of this motion that the documents, in fact, reflect privileged communications. Therefore, our inquiry centers on whether Weil has waived the privilege attending these documents by prior productions to the SEC, Stillman, and the USAO/MDPA.

## A. Production of the ACR to the SEC

█ In our December 22, 1993 ruling, we held that the Audit Committee's production of the ACR to the SEC waived any work-product immunity and attorney-client and self-critical analysis privileges covering the report itself. *In re Leslie Fay I*, 152 F.R.D. at 44, 46 n. 7. While that production, by itself, may not have constituted a broad waiver of privilege attending all of the documents underlying the report, subsequent events render Weil's attempt shield these documents from discovery manifestly unfair.

First, upholding Weil's claim of privilege would substantially prejudice BDO at trial in this action. The conclusions of the ACR, exonerating Leslie Fay's senior management, tend to implicate BDO in the alleged fraudulent scheme by supporting plaintiffs' claim that BDO was grossly negligent in failing to discover the accounting irregularities. BDO, on the other hand, claims that senior management orchestrated the scheme, concealing its intentions from BDO as well as Leslie Fay's stockholders. Since many upper management officials will likely take the Fifth Amendment, and "recreating" the voluminous work underlying the ACR years after the alleged fraud was perpetrated would be next to impossible, denying BDO access to these documents will significantly impair BDO's ability to defend itself against charges of improprieties. Having already waived the

attorney-client privilege to the facts and analysis disclosed in the ACR, the Audit Committee should not be allowed to withhold the documents on which it is based to BDO's prejudice.

More importantly, however, the Company's efforts to use the report's conclusions affirmatively against BDO requires that they provide the underlying documents to BDO. In April 1995, the Equity Committee filed an adversary proceeding in the bankruptcy court against BDO on behalf of the Company for professional negligence, negligent misrepresentation, breach of contract, and breach of warranty. *The Leslie Fay Cos. v. BDO Seidman*, No. 95–8940A (Bankr.S.D.N.Y. filed April 5, 1995). That suit, now pending before this Court, centers on the culpability of BDO and former Leslie Fay management in misstating Leslie Fay's 1991 and 1992 financial statements. Attempting to shield the documents underlying the ACR from discovery while at the same time urging this Court to award it damages in reliance, at least in part, on the ACR's conclusions, the Audit Committee seems guilty of the exact conduct that the subject matter waiver doctrine was formulated to address. As this Circuit has stated in other contexts, "[the] selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir.1993). We think that that principle is equally applicable here, when the Company has voluntarily disclosed to the SEC the ACR exonerating Leslie Fay management and later sued BDO based on the report's findings. This is precisely the situation *von Bulow* envisions as constituting a subject matter waiver of the attorney-client privilege. *von Bulow*, 828 F.2d at 103 (requiring affirmative use by privilege-holder or prejudice to attacking party to find subject matter waiver).[5]

---

5. We note that some courts have interpreted *von Bulow* as endorsing a subject matter waiver only when confidential communications are selectively disclosed in the course of an ongoing litigation to gain tactical advantage. *See Stratagem Dev. Corp. v. Heron Int'l N.V.*, No. 90 Civ. 6328, 1993 WL 6216, at *3 (S.D.N.Y. Jan. 6, 1993) (applying subject matter waiver to intrajudicial not extrajudicial disclosures). We do not read its holding so narrowly. *See Bowne*, 150 F.R.D. at 484. While in one sense the ACR's production to the SEC was "extrajudicial" because the Company was in bankruptcy and no longer a defendant in this case at the time of the disclosure, clearly the

■ Having determined that the Audit Committee has waived any privilege covering the subject matters discussed in the ACR, we do not necessarily abrogate any claim of privilege Weil may assert regarding the underlying ACR documents. We note that an equitable piercing of the attorney-client privilege should be narrowly tailored to address the potential prejudice to the party attacking the privilege. *Brock Equities, Ltd. v. Josephthal, Lyon & Ross, Inc.*, No. 92 Civ. 8588, 1993 WL 350026, at *1 (S.D.N.Y. Sept. 9, 1993). For instance, to the extent that any document reflects Weil's legal analysis or advice, those portions of the document need not be produced. On the other hand, interview notes and financial data summarized in the report are discoverable. We merely hold that BDO is entitled to its requested discovery unless Weil can show, on a document by document basis, that the contents of any document to be withheld from discovery contain legal analysis or advice not contained or discussed in the ACR.

### B. Production to the USAO/MDPA, Stillman, and the AA Audit Team

■ Since our ruling does not completely foreclose Weil's claim of privilege, we must briefly address BDO's other arguments that the Audit Committee has waived any such claim. First, BDO asserts that by producing ACR underlying documents to the USAO/MDPA and to Examiner Stillman and the Creditor's Committee, the Audit Committee has waived any privilege covering these materials. However, both of these disclosures were made pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents. Specifically, as to the Stillman disclosures, the bankruptcy court ordered that the production of these documents "shall not be deemed to be a breach of any available attorney/client

or work product privilege." *In re The Leslie Fay Companies, Inc.*, No. 93–B–41724 (Bankr.S.D.N.Y. Dec. 16, 1993) (Order Pursuant to Sections 1104(b) and 1106(b) of the Bankruptcy Code Directing the Appointment of an Examiner). The bankruptcy court clearly entered the order in part to facilitate disclosure between Stillman and the Company and avoid unnecessary duplication of the Audit Committee's efforts. Even though Stillman's investigation is now complete, we see no reason to undermine the order's initial intent by declaring the disclosures to be a waiver of the privilege, and BDO offers no such reason. Moreover, we feel that by restricting Stillman's use of the documents, that court protected against a waiver of the privilege. *Cf. Steinhardt*, 9 F.3d at 236.

■ Similarly, the USAO/MDPA agreed to hold all materials produced to it by the Company in confidence, disclosing the material to third parties only as necessary to further law enforcement objectives. In *Steinhardt*, the Second Circuit indicated that the disclosure of privileged information to the government may not constitute a waiver if the government agrees to maintain the confidentiality of the disclosed materials. *Id.* We think that the May 23 agreement satisfies the standard articulated in *Steinhardt*.[6]

■ Finally, BDO argues that the Audit Committee's disclosure of its investigatory documents to the AA Audit Team constituted a waiver of the privilege. BDO asserts that because the Audit Committee's investigation in large part mirrored the AA Audit Team's investigation, the two parties must have shared information, including privileged communications between Weil and the Auditing Committee. Weil contends that apart from general discussions between the AA Investigation and Audit Teams, the Audit Committee did not provide any privileged documents

Equity Committee plans to utilize the conclusions of the report, disclosing the results of communications between Weil and the Company, to advance its position in its suit against BDO. We think that this use brings the Company's conduct within the scope of the subject matter waiver rule.

6. Weil also argues that the USAO/MDPA disclosures were made in the common interests of the

government and the Company, thereby preventing a waiver. *See Steinhardt*, 9 F.3d at 236 (recognizing that disclosure of privileged material to government agency with common interest may not constitute a waiver). Because we find that the confidential agreement prevents a waiver, we need not address the common interests of Weil and the USAO/MDPA.

resulting from its investigations to the AA Audit Team. We do not think that the Audit Committee waived any privilege it had by disclosing confidential communications to the outside auditors. Apart from speculative inference, BDO can point to no document that was actually given to the auditing team. Absent such evidence, we cannot conclude that the Audit Committee has waived its privilege covering any document in this way.

## IV. THE CRIME–FRAUD EXCEPTION

 Finally, BDO asserts that because the ACR was deliberately altered by the Audit Committee to shield upper management from liability, the Committee can assert no privilege as to documents underlying its creation. As the Second Circuit has indicated, "communications that otherwise would be protected by the attorney-client privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1038. We do not think BDO has supplied sufficient evidence for us to conclude that the ACR was a sham to cover management's fraud. To sustain its burden, BDO must make at least a *prima facie* showing that the ACR was manipulated to support a false attribution of responsibility for the fraud. *Id.* at 1039. However, the Stillman reports, which BDO does not challenge as similarly false, reach essentially the same conclusions as the ACR. Absent further evidence of fraud, we do not think that BDO should be entitled to discovery of the documents underlying the ACR under the crime-fraud exception.

## CONCLUSION

For the foregoing reasons, we rule that Weil, Gotshal & Manges must produce the documents underlying the Audit Committee Report unless they can demonstrate, on a document-by-document basis, that the documents withheld from discovery contain legal analysis or advice not discussed in the Audit Committee Report.