## NAVIGANT CONSULTING, INC., Plaintiff,

v.

## John WILKINSON, et al., Defendants.

### No. 3–02–CV–2186–D.

United States District Court, N.D. Texas, Dallas Division.

March 29, 2004.

Douglas D. Haloftis, Gardere Wynne Sewell, Michael P. Lynn, Lynn Tillotson & Pinker, Dallas, TX, for Plaintiff.

Shannon D. Norris, Apple & Norris, Coppell, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

Defendants John Wilkinson, Sharon Taulman, and Robert Canales have filed a motion to compel the production of 112 documents withheld from discovery by Plaintiff Navigant Consulting, Inc. ("NCI") on the grounds of attorney-client privilege and attorney work product. For the reasons stated herein, the motion is granted in part and denied in part.

I.

NCI provides class action settlement processing services to clients in the United States and Canada. (Plf. Sec. Am. Compl. at 2, ¶ 10). Among these services are compiling information and data from thousands of po-

tential claimants, operating a call center, and calculating and distributing payments based on specific criteria established by courts or parties to settlement agreements. (*Id.*). According to NCI, a key element to maintaining a competitive advantage in the class action settlement processing business is the ability to perform services accurately and at a low cost. (*Id.* at 3, ¶ 11). The ability to safeguard confidential financial and personal data submitted by claimants is also an important consideration to courts and parties who select settlement administrators. (*Id.*). To accomplish the complicated administrative tasks associated with class action settlement processing, NCI designed and built a customized computer software program known as the "Class Action Administration System." (*Id.* at 3, ¶ 12). This program, which was developed over many years at a cost of more than $500,000, performs a variety of functions, including: (1) gathering data and information relevant to particular aspects of the lawsuit; (2) modifying the input screens related to the data necessary for the settlement procedures; (3) adjusting the calculation of settlement amounts or awards; (4) interpreting, sorting, and utilizing client information as required by the settlement; and (5) generating reports. Because every settlement is unique, the software must be customized for each case at an additional cost. (*Id.*).

John Wilkinson and Sharon Taulman were managing directors of NCI's class action settlement processing business Dallas, Texas. (*Id.* at 2, ¶¶ 7, 8). Another NCI employee, Roberto Canales, was a key advisor to Wilkinson on information technology issues. (*Id.* at 2, ¶ 9). When Wilkinson and Taulman were hired,[1] both signed confidentiality agreements. The agreements provide, in pertinent part:

> In consideration of my employment with [NCI], I hereby agree that I will not publish, use or disclose to any other person or entity, either directly or indirectly, any Confidential Information I receive in the course of my work with [NCI]. "Confidential Information" means any information, whether written or not, that is not general-

ly known in the industry, or that has been treated by the Firm as confidential, or that is of competitive advantage to the firm, or that relates to the business operations, customers or clients of the Firm. My obligation to not disclose any Confidential Information shall continue during and after my working relationship with [NCI].

(*Id.* at 5, ¶ 17 & 7, ¶ 23). Canales entered into a similar confidentiality agreement as a condition of his employment. (*Id.* at 15, ¶ 53). In addition, as managing directors, Wilkinson and Taulman were prohibited from competing with NCI or soliciting any of its clients if they left the company. (*Id.* at 9–10, ¶¶ 33, 34(d)).

Sometime around the summer of 2001, Wilkinson and Taulman decided to leave NCI and allegedly "formulated a secret plan to market and 'sell' to NCI's competitors a business that they did not own—NCI's Dallas class action settlement administration business." (*Id.* at 15, ¶ 54). In furtherance of this illicit plan, NCI contends that Wilkinson instructed Canales to download information from company servers, including proprietary software and client databases, to a non-NCI server that was removed to an unknown location. (*Id.* at 20–21, ¶ 84). This activity continued for three consecutive months until Jordan Allen, another Dallas-based employee, reported Canales and Wilkinson to the IT Department in Chicago, Illinois. (*Id.* at 21, ¶ 84; Plf.App. at 79–80, ¶ 14). On August 23, 2002, Philip P. Steptoe, General Counsel for NCI, traveled to Dallas to confront Wilkinson, Taulman, and Canales about these "surreptitious backups." (Plf. Sec. Am. Compl. at 21, ¶ 85; Plf.App. at 80, ¶ 16). At this interview, Wilkinson admitted that he had instructed Canales to backup the NCI servers, but claimed it was done as part of a local disaster recovery system for the Dallas office. (Plf. Sec. Am. Compl. at 21, ¶¶ 86–87). Steptoe ordered Wilkinson to stop making unauthorized backups. (Plf.App. at 81, ¶ 18). Wilkinson agreed and promised to purge the non-NCI server of any data. (*Id.*; Plf. Sec. Am. Compl. at 22, ¶ 90). However, two days later, an IT technician in the Dallas

---

1. Wilkinson and Taulman were originally hired by Peterson Consulting, LLC, which was acquired by NCI in 1998. (*See* Plf. Sec. Am. Compl. at 5–6, ¶¶ 16, 22 & 8, ¶ 29).

office observed Canales attempting to copy NCI software and client data files onto CD ROMs. (*Id.* at 23, ¶ 97; Plf.App. at 82, ¶ 19).

Before leaving for Dallas on August 23, 2002, Steptoe hired Doug Haloftis and Celeste Yeager Winford, attorneys with the law firm of Gardere Wynne Sewell, LLP, to act as local counsel in the event legal proceedings were necessary. (Plf.App. at 80, ¶ 15). After learning of this latest incident, Steptoe asked the Gardere lawyers to help with the investigation by interviewing Wilkinson, Taulman, and Canales. (*Id.* at 82–83, ¶ 21). On September 26, 2002, while the investigation was still ongoing, Wilkinson and Taulman resigned from NCI. (Plf. Sec. Am. Compl. at 23, ¶ 99; Plf.App. at 83, ¶ 22). Canales resigned on October 1, 2002. (Plf. Second Am. Compl. at 25, ¶ 114). Within days, all three defendants and two other NCI employees went to work for LECG, LLP, a competitor in the class action settlement processing business. (*See id.* at 23–26, ¶¶ 100–116).

On October 8, 2002, NCI sued defendants in Dallas federal court for misappropriation of trade secrets, conversion, breach of contract, breach of fiduciary duty, tortious interference with contracts, and violations of the Illinois Trade Secret Act.[2] Defendants have counterclaimed for defamation and breach of contract. As part of their pretrial discovery, defendants served a request for production on NCI. This document request seeks, *inter alia:*

24. All documents that evidence, refer or relate to the investigation into the non-NCI server or the alleged "surreptitious backups" conducted at the Dallas office.

25. All documents that evidence, refer or relate to contemporaneous notes, correspondence or memoranda regarding employee interviews conducted in connection with the investigation into the alleged "surreptitious backups" conducted in the Dallas office.

26. All documents that evidence, refer or relate to statements or comments made by Defendants or any other employees interviewed in connection with the investigation into the alleged "surreptitious backups" conducted in the Dallas office.

(Def.App. at 14, ¶¶ 24–26). NCI objected to each request to the extent it sought information protected by the attorney-client privilege or the work-product doctrine. A privilege log identifying the documents withheld from production also was furnished to opposing counsel. Subject to those objections, NCI produced the minutes of an April 2002 Board of Directors meeting, which referred to a separate internal investigation conducted by NCI after more than 50 employees resigned and went to work for LECG during the early months of 2002. After receiving the board minutes, defendants requested additional documents from NCI, including:

3. All documents that refer or relate to the "targeted recruiting by a competitor with access to NCI confidential information" referenced in N008016.

4. All documents that refer or relate to any measures you have undertaken to recover or prevent unauthorized use of the "NCI confidential information" referenced in N008016.

\* \* \* \* \* \*

7. All internal correspondence (including but not limited to memoranda or e-mails) that refer or relate to any measures you have undertaken to recover or prevent unauthorized use or disclosure of the "NCI confidential information" referenced in N008016.

(Plf.App. at 12, ¶¶ 3–4 & 7). NCI invoked the attorney-client privilege and work product doctrine with respect to these documents and supplemented its privilege log.

Defendants now move to compel the production of 112 documents withheld from discovery by NCI.[3] As grounds for their motion,

---

2. Federal diversity jurisdiction is proper because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1).

3. Three of the 112 documents listed on the privilege log were produced by NCI after this motion was filed. (Docs. 102, 103 & 105).

defendants contend that the documents are not protected by the attorney-client privilege or work product doctrine or, in the alternative, that NCI has waived its objections by invoking the privilege in a fundamentally unfair way. The issues have been briefed by the parties and the motion is ripe for determination.

## II.

The documents withheld by NCI fall into two broad categories: (1) documents relating to its investigation of employees who went to work for LECG ("LECG Investigation"); and (2) documents relating to its investigation of the "surreptitious backups" allegedly made by defendants ("Wilkinson Investigation"). The court has considered the evidence submitted by the parties and reviewed the documents *in camera* in order to determine whether any or all of these materials are privileged or constitute attorney work product.[4]

### A.

█ The attorney-client privilege serves to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). This privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.,* 101 S.Ct. at 682, citing *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). While the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Hence, the privilege does not protect documents and other communications simply because they result from an attorney-client relationship. *See Seibu Corp. v. KPMG LLP,* 2002 WL 87461 at *2 (N.D.Tex. Jan.18, 2002) (Kaplan, M.J.) (citing cases). Moreover, courts generally construe the privilege narrowly because "assertion of privileges inhibits the search for truth." *Perkins v. Gregg County, Texas,* 891 F.Supp. 361, 363 (E.D.Tex.1995) (citing cases).

█ The parties agree that Texas law governs the resolution of the privilege issues in this diversity case. *See* FED.R.EVID. 501; *Seibu,* 2002 WL 87461 at *1. Under Texas law, the elements of the attorney-client privilege are: (1) a confidential communication; (2) made for the purpose of facilitating the rendition of professional legal services; (3) between or amongst the client, lawyer, and their representatives; and (4) the privilege has not been waived. TEX.R. EVID. 503(b); *Huie v. DeShazo,* 922 S.W.2d 920, 923 (Tex. 1996). The burden is on the party asserting the privilege to demonstrate how each document or communication satisfies these elements. *See Hodges, Grant & Kaufmann v. United States,* 768 F.2d 719, 721 & n. 7 (5th Cir.1985) (citing cases). A general allegation of privilege is insufficient to meet this burden. *See Nutmeg Insurance Co. v. Atwell, Vogel & Sterling,* 120 F.R.D. 504, 510 (W.D.La.1988); *Saxholm AS v. Dynal, Inc.,* 164 F.R.D. 331, 333 (E.D.N.Y.1996). Instead, "a clear showing must be made which sets forth the items or categories objected to and the reasons for that objection." *Caruso v. The Coleman Co.,* 1995 WL 384602 at *1 (E.D.Pa. Jun.22, 1995). The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the privilege exists. *Id.* Although a privilege log and an *in camera* review of documents may assist the court in conducting its analysis, a party asserting the privilege still must provide "a detailed description of the materials in dispute and state specific and precise reasons

---

4. In support of their respective arguments, defendants have submitted the Affidavit of Jack Wilkinson and NCI has provided the Declaration of Philip P. Steptoe. (Def.App., Exh. 2; Plf.App., Exh. F). The court also has considered excerpts from the depositions of two NCI employees, Julie Howard and Jordan Allen, and NCI's Third Revised Privilege Log. (Def.App., Exhs. 7 & 8; Plf. Resp., Exh. B).

for their claim of protection from disclosure." *Pippenger v. Gruppe*, 883 F.Supp. 1201, 1212 (S.D.Ind.1994), *quoting Snowden, by and through Victor v. Connaught Laboratories, Inc.*, 137 F.R.D. 325, 334 (D.Kan.1991); *see also Greene, Tweed of Delaware, Inc. v. Du-Pont Dow Elastomers, L.L.C.*, 202 F.R.D. 418, 423 (E.D.Pa.2001); *Diamond State Insurance Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 699 (D.Nev.1994). In fact, "resort to an *in camera* review is appropriate only *after* the burdened party has submitted detailed affidavits and other evidence to the extent possible." *Caruso*, 1995 WL 384602 at *1 (emphasis in original).

### 1.

 The court notes at the outset that NCI has failed to adduce sufficient evidence, other than the documents themselves, to establish its claim of privilege. Initially, NCI produced only the Declaration of Philip P. Steptoe in support of its privilege and work product claims. While this declaration provides a wealth of information about the facts and circumstances giving rise to the LECG and Wilkinson Investigations, it wholly fails to explain how these facts bring any particular document within the ambit of the attorney-client privilege. Instead, Steptoe seems to assume that all documents relating to these investigations are privileged because they were made by or sent to in-house or outside counsel at a time when NCI was considering possible litigation. Such a categorical approach to the attorney-client privilege is not proper. *See Greene, Tweed of Delaware*, 202 F.R.D. at 423 ("A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality."). The privilege protects only confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. *See Seibu*, 2002 WL 87461 at *2. Either separately or together, the Steptoe declaration and the Third Revised Privilege Log are not sufficient to make this showing.

Stymied by this evidence, the court ordered NCI to produce the challenged documents for *in camera* review. The court has now labored through more than 550 pages of documents in an attempt to glean information that might shed additional light on the privilege issues raised by the instant motion. However, in most instances, the court has been left to speculation and guess-work in interpreting the documents. *See Pippenger*, 883 F.Supp. at 1212 (attempt to determine existence of privilege absent adequate factual foundation wastes judicial time and resources). Only those few that contain pure legal advice clearly are privileged. Although other documents contain information that may have been communicated to or from counsel for the purpose of facilitating the rendition of legal advice (*see, e.g.*, Docs. 8, 33, 34, 39, 48, 61, 63–65, 68, 71–73, 78–78, 82–90, 92–93, 98–99, 101, 104, 106–110), neither the documents themselves nor the Steptoe declaration are sufficient to enable the court to reach that conclusion.

### 2.

 Most of the documents related to the LECG Investigation consist of e-mails and memos to and from NCI and its attorneys. (*See* Plf. Resp., Exh. A, Docs. 5–19, 22, 25–28, 30–38, 40–54, 56–57, 59–60 & 66). NCI describes the subject matter of these communications in various terms, such as "litigation assessment," "potential claims," or "possible litigation." (*See id.*, Exh. A). In his declaration, Steptoe states that employee e-mails were monitored and reviewed "for the purpose of determining whether we had sufficient basis to bring a lawsuit against LECG or such employees." (Plf.App. at 77, ¶ 8). However, the fact that NCI may have contemplated litigation against some or all of its former employees does not make every communication with in-house and outside counsel on this subject privileged. The attorney-client privilege applies only to communications "made for the purpose of facilitating the rendition of professional *legal services* to the client." TEX.R. EVID. 503(b) (emphasis added); *see also Huie*, 922 S.W.2d at 922. "Where an attorney is functioning in some other capacity—such as an accountant, investigator, or business advisor—there is no privilege." *Seibu*, 2002 WL 87461 at *2; *Huie*, 922 S.W.2d at 927; *In re*

*Texas Farmers Insurance Exchange,* 990 S.W.2d 337, 341 & n. 2 (Tex.App.—Texarkana 1999, pet. denied).

The vast majority of documents withheld by NCI discuss either the logistics of monitoring employee e-mails (*see* Docs. 22–26, 30–32, 40, 46–47, 49, 52–54, 58–60), or simply request the names, addresses, departure dates, and number of options held by former NCI employees, as well as copies of their confidentiality agreements (*see* Docs. 6–7, 9–19, 27, 29, 35–37, 41–45, 51, 56, 57). Document 55 is a detailed forensic analysis of one employee's laptop computer, including a print out of all data contained therein. NCI has failed to establish that any of this information was communicated to counsel for the purpose of facilitating the rendition of legal advice to the client. The documents are not privileged merely because they were prepared by or sent to an attorney. *See Thurmond v. Compaq Computer Corp.,* 198 F.R.D. 475, 479 (E.D.Tex.2000).

■■■■ A number of the documents also consist of communications between non-lawyers or were circulated by counsel to NCI employees. (*See* Docs. 20, 24, 46, 47, 50, 51, 52, 55, 58). Although the attorney-client privilege extends to communications between "representatives of the client," a party invoking the privilege must show that each person privy to the communication: (1) had the authority to obtain professional legal services on behalf of the client; (2) had authority to act on legal advice rendered to the client; or (3) made or received the confidential communication while acting within the scope of his employment for the purpose of effectuating legal representation to the client. *Seibu,* 2002 WL 87461 at *2, *citing* TEX.R. EVID. 503(a)(2)(A)-(B). The only evidence offered by NCI in this regard is an unverified list of employees whose names appear on the privilege log and a cryptic description of their involvement in the case. Assuming *arguendo* that such evidence is admissible, it is insufficient to establish that the recipients of the communications were "representatives" of NCI under Tex.R. Evid. 503(a)(2).

■■■■ Only two documents related to the LECG Investigation give the court more than momentary pause for consideration of the privilege issue. Document 5 consists of minutes of an NCI compensation committee meeting held July 13, 2001. The redacted portions of this document discuss hiring and compensation matters, not legal advice. By contrast, the redacted portions of Document 66, minutes of an audit committee meeting held August 13, 2002, clearly contain legal advice and opinions. Consequently, those redactions are privileged and need not be produced.

### 3.

■■■■ NCI also objects to the production of certain documents related to the Wilkinson Investigation. (Plf. Resp., Exh. A, Docs. 1–4, 61, 64–65, 68–101, 104 & 106–112). As previously discussed, Philip P. Steptoe traveled to Dallas on August 23, 2002 to investigate "surreptitious backups" of confidential and proprietary data allegedly made by defendants. According to Steptoe, the purpose of that trip was:

> (1) to find out what was going on and if something was wrong, to fix it; (2) to find out whether this unusual copying had anything to do with any intention by Wilkinson and Taulman to leave NCI; (3) to meet with the whistleblower, . . . and to protect him from any potential retaliation; and (4) somehow to accomplish all this without "blowing up" the Dallas class action settlement practice.

(*Id.* at 80, ¶ 16). Before meeting with defendants, Steptoe hired the Gardere law firm as local counsel "to help with any necessary legal actions that might in the worst case be necessary in Dallas, such as temporary restraining orders, replevin actions to recover the non-NCI server, and/or the removal of employees from the office." (*Id.* at 80, ¶ 15). Thereafter, Steptoe asked the Gardere attorneys "to assist me in investigating possible wrongdoing related to the unauthorized back-ups by conducting interviews of the Defendants." (*Id.* at 82–83, ¶ 21). According to Steptoe:

> If the investigation indicated that Defendants were improperly trying to take NCI's confidential information and trade secrets, I had no doubt there would be a

lawsuit, if for no other reasons than to recover the misappropriated information and to recover large retention bonuses that NCI had paid to Wilkinson and Taulman to ensure their fidelity. If I had not been contemplating the possible need for litigation, I would have asked Bill Jones, the NCI manager to whom Wilkinson and Taulman directly reported, to conduct these interviews along with a representative of the IT department. By having Gardere do the interviews, I hoped to get an independent evaluation of Wilkinson's and Taulman's credibility and the plausibility of their explanations from experienced and objective lawyers, and also to impress upon Wilkinson and Taulman how seriously I viewed this matter.

(*Id.* at 82–83, ¶ 21).

The mere fact that NCI may have been contemplating litigation does not establish that the communications to and from its outside counsel were made for the purpose of facilitating the rendition of legal advice. To the contrary, it appears that Steptoe wanted the Gardere lawyers to interview Wilkinson and Taulman in order to get an independent and objective assessment of their credibility and to impress upon defendants the seriousness with which he viewed their actions. This suggests a business rather than a legal purpose.[5] Unless the documents contain confidential communications made for the purpose of facilitating the rendition of legal advice, there is no privilege. The court is unable to reach such a conclusion on the evidence presented.

Having reviewed the documents, the court finds that only portions of Documents 61 and 75 are privileged communications between attorney and client. The sixth and seventh pages of Document 61 contain notes of conversations between Steptoe and outside coun-

sel regarding possible claims against defendants. Document 75 includes a nine-page legal memorandum from an attorney at the Chicago law firm of Winston & Strawn. Only those documents contain confidential communications made for the purpose of facilitating the rendition of professional legal services. The other documents withheld by NCI have not been shown to be privileged and must be produced.[6]

**B.**

■■■ NCI further maintains that certain documents are exempt from discovery under the attorney work product doctrine. Work product is not a substantive privilege within the meaning of Fed.R.Evid. 501. *Interphase Corp. v. Rockwell International Corp.,* 1998 WL 664969 at *4 (N.D.Tex. Sept.22, 1998) (Kaplan, M.J.); *see also Pete Rinaldi's Fast Foods, Inc. v. Great American Insurance Cos.,* 123 F.R.D. 198, 201 (M.D.N.C.1988) (work product doctrine is merely a qualified immunity from discovery "not having an intrinsic value outside the litigation arena"). Therefore, the resolution of this issue is governed by federal law. *Interphase,* 1998 WL 664969 at *4; *Varuzza by Zarrillo v. Bulk Materials, Inc.,* 169 F.R.D. 254, 257 (N.D.N.Y.1996); *In re Combustion, Inc.,* 161 F.R.D. 51, 52 (W.D.La.1995).

■■■ Fed.R.Civ.P. 26(b)(3) provides that only documents prepared "in anticipation of litigation" are exempt from discovery. *See Dunn v. State Farm Fire & Casualty Co.,* 927 F.2d 869, 875 (5th Cir.1991). The documents need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. *See In re Leslie Fay Cos., Inc. Securities Litigation,* 161 F.R.D. 274, 280 (S.D.N.Y.1995). However, they must have been prepared be-

---

5. This conclusion is supported by an e-mail from Steptoe to another attorney, Reid Broda, after his trip to Dallas. When Broda asked if NCI needed his law firm to conduct additional research, Steptoe replied, "I don't think we need any further legal research for now, we have a difficult *business decision* to make." (Doc. 75 at 1) (emphasis added).

6. The court notes that portions of Documents 1–4, a series of e-mails between NCI Associate

General Counsel Wayne Koprowski and various members of the Financial and Claims Division, also contain legal opinions. However, those e-mails were circulated to at least five different people, including Wilkinson and Taulman. Similarly, Document 110, an e-mail from Steptoe regarding plans to sue defendants, was distributed to five other NCI employees, none of whom are shown to be "representatives of the client" for purposes of Tex.R. Evid. 503(a)(2).

cause of the prospect of impending litigation and not for some other purpose:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

*Id., quoting* 8 C. WRIGHT, A. MILLER & R. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024 (2d ed.1994). Stated differently, a document is entitled to work product protection if "the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Electronic Data Systems Corp. v. Steingraber,* 2003 WL 21653414 at *4 (E.D.Tex. Jul. 9, 2003), *quoting United States v. Davis,* 636 F.2d 1028, 1039 (5th Cir.1981). Among the factors relevant to determining the primary motivation for creating a document are "the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Id.* at *5, *citing Piatkowski v. Abdon Callais Offshore, L.L.C.,* 2000 WL 1145825 at *2 (E.D.La. Aug.11, 2000). If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation. *Id.*

#### 1.

■ NCI contends that 21 documents related to the LECG Investigation are attorney work product. (Plf. Resp., Exh. A, Docs. 5, 21, 23–29, 32–34, 38–39, 46–48, 51, 55–56 & 58). In his declaration, Steptoe states that the "forensic review of certain former employees' electronic files was very unusual for NCI and only done for the purpose of determining whether we had sufficient basis to bring a lawsuit against LECG or such em-

ployees." (Plf.App. at 77, ¶ 8). However, Steptoe acknowledges that employees are routinely warned that any communications on company systems are subject to monitoring. (*Id.* at 77, ¶ 7). Julie Howard, Vice President of Human Resources, testified that NCI has conducted internal investigations in the past when theft or inappropriate use of resources was suspected. (*See* Def.App. at 57–58). Moreover, in seeking authorization to audit the computers of two former employees, Steptoe never alluded to the possibility of litigation. His only concern was "that there may have been unauthorized disclosure of NCI confidential information to LECG prior to their departure." (Doc. 52).

It appears that NCI's primary motivation in preparing these documents was the protection of its confidential information. "In the realities of today, investigations of corporate wrongdoing are routine, expected and necessary for many reasons, including protecting shareholders, assessing losses, and the prevention of future corporate wrongdoing." *Electronic Data Systems,* 2003 WL 21653414 at *5. While information developed during the course of this investigation may be helpful in legal proceedings against the defendants and LECG, NCI has failed to establish that "the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Id.*

#### 2.

■ The court reaches the same conclusion with respect to documents generated by NCI in connection with the Wilkinson Investigation. (Plf. Resp., Exh. A, Docs. 1, 61–65, 67, 69–79, 82–85, 87–94, 96–97, 104 & 106–109). Although Steptoe asked outside counsel to investigate possible legal causes of action, the prospect of litigation does not appear to have been the primary motivating purpose behind the investigation. The four reasons advanced by Steptoe for confronting the defendants about their "surreptitious backups" suggest a business-motivated desire to practice damage control. (*See* Plf. App. at 80, ¶ 16). Steptoe stated that he considered litigation a "worst case" scenario. (*Id.* at 80, ¶ 15). He hired Haloftis and Winford to assist with the investigation "to

get an independent evaluation of Wilkinson's and Taulman's credibility and the plausibility of their explanations" and to "impress upon [them] how seriously I viewed this matter." (*Id.* at 83, ¶ 21). Indeed, Steptoe's own contemporaneous statement reveals the true motivation behind the Wilkinson Investigation: "I don't think we need any further legal research for now, we have a difficult *business decision* to make." (Doc. 75 at 1) (emphasis added). This statement speaks louder than the *post hoc* explanation offered by NCI. The court therefore concludes that none of the documents withheld from production constitute attorney work product.

### C.

 Finally, defendants argue that NCI has waived any privilege under the offensive use doctrine. An offensive use waiver occurs when: (1) the party asserting the privilege seeks affirmative relief; (2) the information, if believed by the trier of fact, would probably be outcome determinative; and (3) disclosure of the privileged communication is the only means of obtaining the evidence. *TransAmerican Natural Gas Corp. v. Flores,* 870 S.W.2d 10, 11–12 (Tex. 1994); *Marathon Oil Co. v. Moye,* 893 S.W.2d 585, 590 (Tex.App.—Dallas 1994, no writ).

Of the three documents the court has found to be privileged, none is outcome determinative of the litigation. *See Republic Insurance Co. v. Davis,* 856 S.W.2d 158, 163 (Tex.1993) ("The confidential communication must go to the very heart of the affirmative relief sought."). Rather, the documents consist of minutes of board meetings that discuss matters unrelated to this lawsuit and notes or memoranda of a purely legal nature. Consequently, the offensive use doctrine does not apply.

### CONCLUSION

Defendants' motion to compel discovery is granted in part and denied in part. The motion is denied with respect to the sixth and seventh pages of Document 61, Document 66, and all but the first page of Document 75. In all other respects, the motion is granted.

These documents shall be produced to counsel for defendants by *April 29, 2004.*

SO ORDERED.