**Perry A. GRUSS, Plaintiff,**

v.

**Daniel B. ZWIRN, et al., Defendants.**

**No. 09 Civ. 6441 (PGG)(MHD).**

United States District Court,
S.D. New York.

July 14, 2011.

Ethan Andrew Brecher, Jeffrey Lew Liddle, Maryana A. Kodner, Jennifer Rodriguez, Liddle & Robinson, LLP, New York, NY, for Plaintiff.

Alan Levine, William Henry O'Brien, Cooley Godward Kronish LLP, New York, NY, for Defendants.

### Memorandum & Order

MICHAEL H. DOLINGER, United States Magistrate Judge:

Before us is plaintiff Perry A. Gruss's motion to compel production of certain documents. For the reasons stated below, the motion is denied.

#### A. Background

Plaintiff Perry A. Gruss filed the complaint in this action on July 20, 2009, asserting claims for defamation and breach of contract by the defendants, D.B. Zwirn & Co., L.P., and D.B. Zwirn Partners, LLC (collectively, the "Zwirn Entities"), two companies controlled by individual defendant Daniel B. Zwirn ("Zwirn"). (*See generally* Compl.). Gruss was the Chief Financial Officer ("CFO") of D.B. Zwirn & Co., L.P. and its predecessor company from July 2002 until he resigned in late September or early October 2006, by which time he had become a partner in the company. (*Id.* at ¶¶ 13–14, 33). Zwirn was the Chief Executive Officer ("CEO") and managing partner of the Zwirn Entities, a corporate enterprise consisting of several hedge funds ("the Zwirn Funds") and their management company. (Compl. at ¶ 8; Answer at ¶¶ 1, 109–10, 112–18; Decl. of Daniel B. Zwirn ("Zwirn Decl.") at ¶¶ 1, 3).

Over the course of Gruss's time as CFO of the Zwirn Entities, they grew significantly in size. (*See* Compl. at ¶ 15). Ultimately, this rapid growth resulted in difficulties managing the Zwirn Entities' cash flow and led to financial irregularities surrounding several aspects of the business, including the early collection of management fees from the Zwirn Funds and the purchase of a Gulfstream jet for Zwirn's use. (*See id.* at ¶¶ 25–29). When these financial irregularities came to light in the spring of 2006, the Zwirn Entities hired Schulte, Roth and Zabel, LLP ("SRZ") as outside counsel to perform an internal investigation intended to determine who was responsible for the financial irregularities and how best to remedy them. (*Id.* at ¶ 30; Answer at ¶ 29). SRZ's investigation included interviews of personnel of the Zwirn Entities, including both Gruss and Zwirn. (Answer at ¶ 226). Gruss was ultimately blamed for the irregularities and resigned. (Compl. at ¶¶ 31–33; Answer at ¶¶ 31–33, 102, 228).

In October of 2006, Zwirn contacted investors in the Zwirn Funds, as well as other stakeholders in the Zwirn Entities, and informed them of Gruss's departure. In his communications with them, he used talking points prepared by SRZ. (Compl. at ¶ 34–35; Answer at ¶ 232). Subsequently, defendants hired the law firm Gibson, Dunn, and Crutcher, LLP ("GDC") to conduct a second investigation into the financial irregularities and inform the SEC of its findings. GDC subsequently notified the SEC about the financial irregularities.[1] (Compl. at ¶ 39; Answer at ¶¶ 29, 103–04, 231; *see also* Affirmation of Ethan A. Brecher, Esq. ("Brecher Aff'n") at

---

[1]. The Zwirn Entities also hired the law firm Fried, Frank, Harris, Shriver, & Jacobson LLP ("Fried, Frank") "to coordinate any defense efforts" relating to the irregularities (Defs.' Mem. of Law at 4), but plaintiff has not requested production of any documents created by Fried, Frank in the course of its representation of the Zwirn Entities.

Exs. F, G). GDC's final presentation to the SEC regarding this matter was on March 20, 2007 (*see* Brecher Aff'n at Ex. G), after which the SEC commenced its own investigation of the Zwirn Entities. (Answer at ¶ 288).

At the close of GDC's investigation, Zwirn disclosed both the irregularities and the internal investigations to his investors in a series of telephone calls. Zwirn also sent an investor memorandum detailing GDC's findings to investors in the Zwirn Funds. Over the course of these communications, Zwirn made several statements absolving himself and blaming Gruss for his companies' problems. (Compl. at ¶¶ 34–56; Answer at ¶¶ 232–34, 241–43).

In this lawsuit, Gruss alleges that Zwirn's statements were false and defamatory. (Compl. at ¶¶ 65–84). His defamation claim is based in part on the allegation that Zwirn misrepresented the results of SRZ's investigation by failing to disclose that the "investigation [had] concluded that Harold Kahn, the Chief Operating Officer of the Zwirn Entities, was at a minimum willfully blind to both the use of investor funds for Zwirn's private jet *and* the early taking of management fees[.]" (Pl.'s Mem. of Law at 3). Gruss also asserts breach-of-contract and promissory-estoppel claims, stating that he is owed several million dollars under the terms of the partnership agreement, as his partnership payments would not be forfeited unless his termination was the result of willful misconduct. (*Id.* at 2; Compl. at ¶¶ 57–64, 85–96).

Defendants assert several affirmative defenses to plaintiff's defamation claims, including, most pertinently to this motion, two defenses that reference defendants' "good faith" in making the allegedly defamatory statements. First, defendants assert that the allegedly defamatory statements were "within the sphere of legitimate public concern and . . . [were made] in good faith, and in reliance on the conclusions reached" by the SRZ and GDC investigations. (Answer at ¶ 257). Second, defendants assert that the allegedly defamatory statements were privileged "under the self-interest and common interest privileges" and "were undertaken in good faith, with the absence of malicious intent to injure [plaintiff]." (*Id.* at ¶ 258).

Defendants also assert counterclaims demanding reimbursement for the expenses of the internal investigations, on both breach-of-contract and breach-of-fiduciary-duty theories. (*Id.* at ¶¶ 281–301). Defendants make extensive and specific allegations as to Gruss's misconduct in alleging their counterclaims, including allegations referring to the findings of the two internal investigations. (*Id.* at ¶¶ 102–05, 134–244).

Those findings are contained in several documents. First, SRZ created a memorandum, dated September 11, 2006, which included a section detailing the findings of its investigation. (Brecher Aff'n at Ex. D; O'Brien Decl. at ¶ 3 & Ex. A). Second, on October 4, 2006, SRZ produced a set of talking points to be used by Zwirn when he contacted investors in the Zwirn Funds to inform them of Gruss's departure. (O'Brien Decl. at Ex. B). Third, during and after its investigation, GDC reported its findings to the SEC in at least two separate Powerpoint presentations, given on January 9 and March 20, 2007. (Brecher Aff'n at Exs. F, G; O'Brien Decl. at Exs. E, F). Both of these presentations included summaries of statements made by employees of the Zwirn Entities during their interviews with GDC. (*See generally* Brecher Aff'n at Exs. F, G; O'Brien Decl. at Exs. E, F). Both presentations were made pursuant to a confidentiality agreement with the SEC, dated November 14, 2006. (*See* O'Brien Decl. at Ex. H). Fourth, during or after GDC s investigation, SRZ again provided Zwirn with talking points and a Q & A to be used in Zwirn's communications with investors. (O'Brien Decl. at ¶ 6 & Ex. D; *see also* Cutler Decl. at ¶ 26). Finally, the Zwirn Entities issued a memorandum to their investors on March 26, 2007, that discussed GDC's findings. (Cutler Decl. at ¶ 23; O'Brien Decl. at ¶ 9 & Ex. G). GDC approved the final version of that memorandum. (Cutler Decl. at ¶ 28). All of these documents have been produced to plaintiff in the course of discovery. (O'Brien Decl. at ¶¶ 3–4, 6–9).

After receiving those documents, plaintiff sought production of certain supporting documents created by SRZ and GDC in the course of their investigations, specifically, the

SRZ and GDC attorneys' notes on, and summaries of, all interviews conducted in the course of their investigations. (Pl.'s Mem. of Law at 6 (citing Brecher Aff'n at Ex. E)). Defendants opposed this request, citing attorney-client privilege and the work-product doctrine. (*Id.*). Plaintiff now moves to compel production under Rule 37.

Plaintiff asserts first that the interview notes and summaries are not protected by either the attorney-client privilege or the work-product doctrine. Failing that, plaintiff argues that if the notes and summaries are privileged, defendants have waived the privilege, either by disclosing the investigations' findings to third parties, or by asserting counterclaims and affirmative defenses that rely on those findings. In order to adequately rebut these assertions, plaintiff alleges, he must be able to evaluate whether the conclusions of those investigations were adequately supported by the evidence that they unearthed, and fairness thus requires discovery of all documents created in the course of those investigations, including the notes and summaries of interviews conducted by SRZ and GDC attorneys. We address each contention in turn.

### B. *Attorney–Client Privilege*

As a preliminary matter, we note that the presence (or absence) of the attorney-client privilege in this action will be determined by reference to New York law, since this court's jurisdiction is premised on diversity of citizenship between the parties. *See* Fed.R.Evid. 501; *see also Allied Irish Banks v. Bank of America N.A.*, 240 F.R.D. 96, 102 (S.D.N.Y.2007) (citing, *inter alia, Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2d Cir.1975)). Under New York law, the attorney-client privilege applies only to confidential communications made between a client and his attorney " 'for the purpose of

facilitating the rendition of legal advice or services, in the course of a professional relationship,' " and that are " 'primarily or predominantly of a legal character.' " *Allied Irish Banks,* 240 F.R.D. at 103 (quoting *Rossi v. Blue Cross & Blue Shield,* 73 N.Y.2d 588, 593–94, 542 N.Y.S.2d 508, 511, 540 N.E.2d 703 (1989)). "The proponent of the privilege has the burden of establishing that the information was a communication between client and counsel, that it was intended to be and was kept confidential, and it was made in order to assist in obtaining or providing legal advice or services to the client." *Id.* at 103 (citing, *inter alia, People v. Mitchell,* 58 N.Y.2d 368, 373, 461 N.Y.S.2d 267, 269–70, 448 N.E.2d 121 (1983)).[2] "A communication between an attorney and the agent or employee of a corporation may be privileged where the agent 'possessed the information needed by the corporation's attorneys in order to render informed legal advice.' " *Id.* (quoting *In re Copper Mkt. Antitrust Litig.,* 200 F.R.D. 213, 218 (S.D.N.Y.2001)); *see also Upjohn Co. v. United States,* 449 U.S. 383, 389–96, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (discussing, and rejecting, the principle that attorney-client privilege in the corporate context is limited to a "control group" of high-level employees, and instead applying the privilege to communications made from all employees to attorneys conducting internal investigation).

Interviews of a corporation's employees by its attorneys as part of an internal investigation into wrongdoing and potentially illegal conduct have been repeatedly found to be protected by the attorney-client privilege. *See, e.g., Upjohn,* 449 U.S. at 394–95, 101 S.Ct. 677; *In re John Doe Corp.,* 675 F.2d 482, 488 (2d Cir.1982) ("The *Upjohn* privilege is clearly limited to communications made to attorneys solely for the purpose of the corpo-

2. Essentially the same requirements apply under federal common law. *See, e.g., HSH Nordbank AG New York Branch v. Swerdlow,* 259 F.R.D. 64, 70 n. 6 (S.D.N.Y.2009) (citing *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y.1993)); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 468 & n. 8 (S.D.N.Y.1996) (citing, *inter alia, In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir.1984)). Moreover, as both parties cite to federal caselaw in discussing the pertinent issues in this case, we deem them to have stipulated to the application of federal law, and will apply federal precedents whether they arise out of federal-question cases or diversity cases. *Cf. Robbins & Myers, Inc. v. J.M. Huber Corp.,* 274 F.R.D. 63, 82 (W.D.N.Y. 2011) (citing, *inter alia, Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466, 470 (S.D.N.Y.2003)).

ration seeking legal advice and its counsel rendering it."); *In re Grand Jury Subpoena,* 599 F.2d 504, 510–11 (2d Cir.1979) (finding that first investigation, "conducted primarily by non-lawyer senior officials" was not privileged, but second investigation, conducted by counsel, was privileged); *Robinson v. Time Warner, Inc.,* 187 F.R.D. 144, 146 (S.D.N.Y. 1999); *Carter v. Cornell Univ.,* 173 F.R.D. 92, 95 (S.D.N.Y.1997). This protection extends to the attorneys' notes of those interviews insofar as those notes reflect communications between the employee and counsel.[3] *Upjohn,* 449 U.S. at 397, 101 S.Ct. 677 ("Our decision that the communications by Upjohn employees to counsel are covered by the attorney-client privilege disposes of the case so far as . . . any notes reflecting responses to interview questions are concerned."); *Carter,* 173 F.R.D. at 95 (notes of interviews not disclosed). It is clear to us, therefore, that the notes and summaries of interviews by the law firms in the course of their internal investigations are protected by the attorney-client privilege.

Plaintiff seeks to thwart this conclusion, asserting that the interview notes and summaries are not protected by the privilege because they "were prepared for the business purpose of communicating with investors and other interested business parties, rather than legal purposes[.]" (Pl.'s Mem. of Law at 7). They support this argument by pointing out that the law firms' conclusions were communicated to the SEC and to investors in the Zwirn Entities, and asserting that from this "widespread public dissemination of the [SPR] and [GDC] investigations' conclusions, it is clear that the investigations were undertaken for a business purpose, rather than for the rendering of legal advice, since the Zwirn Entities otherwise would have kept the conclusions of those investigations confidential." (*Id.* at 8).

Defendants counter by stating that they retained SRZ to provide legal advice on several issues, including "whether disclosures should be made, and what should be done concerning possible [SEC] consequences," as well as

> "whether the accounting irregularities were material to investors . . . whether disclosures about the irregularities were required . . . whether anyone responsible for the irregularities should remain at [the Zwirn Entities] and the possibility of related employment litigation . . . whether the accounting irregularities exposed [the Zwirn Entities] to possible regulatory issues, [and] investor lawsuits, and what should be [the Zwirn Entities'] strategy respecting possible litigation."

(Cutler Decl. at ¶¶ 5–6). Defendants also note that, after Gruss was terminated, the Zwirn Entities continued to retain SRZ to "provide advice regarding disclosures and any Fund-related and related management company issues that arose." (*Id.* at ¶ 15). The Zwirn Entities also hired GDC to investigate additional accounting irregularities, perform a second factual investigation, and coordinate their investigation with the SEC. (*See id.*).

■ As the Second Circuit recently observed, the distinction between legal advice and business advice "is not demarcated by a bright line," *In re County of Erie,* 473 F.3d 413, 420 (2d Cir.2007), and hence "[w]e consider whether the predominant purpose of the communication is to render or solicit legal advice." *Id.* at 420 & n. 7 (citing cases); *accord Allied Irish Banks,* 240 F.R.D. at 103; *Spectrum Sys. Int'l v. Chem. Bank,* 78 N.Y.2d 371, 379–80, 575 N.Y.S.2d 809, 815, 581 N.E.2d 1055 (1991). "So long as the communication is primarily or predominantly of a legal character, the privilege is not lost merely by reason of the fact that it also refers to certain nonlegal matters." *Rossi,* 73 N.Y.2d at 594, 542 N.Y.S.2d at 511, 540 N.E.2d 703; *accord, Stenovich v. Wachtell, Lipton, Rosen & Katz,* 195 Misc.2d 99, 106, 756 N.Y.S.2d 367, 376 (N.Y.Sup.Ct.2003) ("The fact that business advice is sought or even given does not automatically waive the [attorney-client] privilege, 'where the advice given is predominantly legal, as opposed to

---

**3.** To the extent that the attorneys' notes and summaries of the interviews "go beyond recording responses to [counsel's] questions," *Upjohn,* 449 U.S. at 397, 101 S.Ct. 677, and instead reach the attorneys' mental processes, we will address them in our discussion of work product. *Cf. id.*

business, in nature [.]'") (quoting *United States v. Davis*, 131 F.R.D. 391, 401 (S.D.N.Y.1990)). "The predominant purpose of a communication cannot be ascertained by quantification or classification of one passage or another; it should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *Erie*, 473 F.3d at 420–21.

■ With this standard in mind, it is irrelevant that both firms' reports "were prepared *in part*, for the business purpose of gaining advice on what to communicate to investors and other interested business parties, rather than legal purposes." (Pl.'s Reply Mem. of Law at 4 (emphasis added)). There can be little question that both firms were engaged to investigate the accounting irregularities at the Zwirn Entities and advise management how to resolve those irregularities. (Cutler Decl. at ¶¶ 4–7, 15–16, 19, 24–28). Their advice included instructions not only on how to communicate with investors, but also on the legal ramifications of the accounting irregularities within the heavily-regulated world of investment contracts, the decision as to which employees should be held responsible and how those employees should be disciplined—advice with clear legal implications when the employee in question was party to a partnership agreement, as was Gruss (Compl. at Ex. A)—and both the possibility of, and strategies for, future litigation. (Cutler Decl. at ¶¶ 5–6).[4] Based on our review of the portions of the law firms' findings that have already been produced, it

is clear that their communications with the Zwirn Entities were predominantly made with the purpose of giving legal advice. The fact that some of this advice resides in the gray area where legal advice shades into business advice does not change that conclusion.[5]

*In re Leslie Fay Companies, Inc., Sec. Litig.*, 161 F.R.D. 274 (S.D.N.Y.1995), the case cited by plaintiff (Mem. of Law at 7), is not to the contrary. *Leslie Fay* dealt with claims arising from accounting irregularities at The Leslie Fay Companies, Inc. ("Leslie Fay"), a publicly-traded corporation. In the course of that litigation, BDO Seidman ("BDO"), the corporation's former outside auditor, filed cross-claims against the corporation and various individual defendants. 161 F.R.D. at 277. BDO sought production of various documents created during Leslie Fay's internal investigation of the accounting irregularities. Leslie Fay and its outside counsel asserted attorney-client privilege and work-product protection for the documents, *id.* at 277, and BDO sought to defeat both privileges by asserting that the documents had been created for business purposes, not to provide legal advice or in anticipation of litigation. *Id.* at 279. Although the Court ultimately did not decide whether the documents were privileged, focusing instead on whether any privilege in the documents had been waived, it did state "that the documents at issue, absent a waiver, [were] probably covered by the [attorney-client] privilege," and found "no basis for concluding that they were not prepared by Weil ... in the course of offering legal advice, as opposed to business advice, to the Audit Committee." *Id.* at

4. We are of course not bound by defendants' characterization of the communications as being made for the purpose of rendering legal advice, but plaintiff has given us "no reason to disregard the sworn statements describing the engagement as one for legal not business advice." *Spectrum Sys. Int'l Corp.*, 78 N.Y.2d at 379–80, 575 N.Y.S.2d at 815, 581 N.E.2d 1055.

5. Even if we were to agree with plaintiff's argument as to the SRZ investigation, it is clear that the GDC investigation was undertaken with an eye toward a possible enforcement action by the SEC. GDC was retained by the Zwirn Entities on October 19, 2006 (*see* O'Brien Decl. at Ex. C), and the Zwirn Entities self-reported their accounting irregularities to the SEC on October 30,

2006. (*See* O'Brien Decl. at Ex. H). It is of course true that "the attorney-client privilege is not tied to the contemplation of litigation," *Spectrum Sys. Int'l Corp.*, 78 N.Y.2d at 380, 575 N.Y.S.2d at 815, 581 N.E.2d 1055, but the obvious potential for litigation (and the client's likely desire to avoid it) reinforces our conclusion that communications in the context of the latter investigation were made for the purpose of securing legal advice. *See id.; cf. also In re Grand Jury Subpoena*, 599 F.2d at 510–11 (finding that first investigation, "conducted primarily by non-lawyer senior officials" was not privileged, but second investigation, conducted by counsel, was privileged).

282. This decision reinforces our conclusion that the attorney-client privilege protects documents created by defendants' outside counsel in the course of their investigation into accounting irregularities.

Finally, plaintiff's argument that the attorney-client privilege did not attach because of the disclosure of the law firms' findings to the SEC and investors (*see* Pl.'s Reply Mem. of Law at 4) is more properly directed to the possibility that the Zwirn Entities waived the privilege, rather than to the idea that the privilege never applied. We will therefore address it in our consideration of waiver.

### C. *Work Product*

"The work-product doctrine is embodied in Fed.R.Civ.P. 26(b)(3), which offers qualified immunity from discovery for documents 'prepared in anticipation of litigation or for trial.'" *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 462 (S.D.N.Y.1996) (quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y. 1993)). "The doctrine 'is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye towards litigation, free from unnecessary intrusion by his adversaries.'" *Allied Irish Banks*, 240 F.R.D. at 105 (quoting *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998)) (internal quotation marks omitted). "Though the work product doctrine protects both factual and opinion work product, the latter—defined as 'the attorney's mental process,' . . .—is considered to be 'at the core' of the doctrine, and . . . 'receives special protection not accorded to factual material.'" *Id.* (citing, *inter alia*, *Adlman*, 134 F.3d at 1197; *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)) (internal citations and brackets omitted). Even when a court orders production of factual work product, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. Pro. 26(b)(3)(B); *see also, e.g., Upjohn*, 449 U.S. at 399, 101 S.Ct. 677 ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly dis-

favored because it tends to reveal the attorney's mental processes[.]"); *Hickman v. Taylor*, 329 U.S. 495, 511–13, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

"Three conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." *Allied Irish Banks*, 240 F.R.D. at 105 (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002) and citing cases) (internal quotation marks omitted). Only the second condition is in dispute here, and so we consider whether the interview notes and summaries were prepared in anticipation of litigation. A document was prepared in anticipation of litigation for purposes of Rule 26 when, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Adlman*, 134 F.3d at 1202 (emphasis in original) (quoting 8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *Federal Practice and Procedure*, § 2024, at 343 (1994)). Under this rubric, "[w]here a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection . . . merely because it is created in order to assist with a business decision." *Id.* On the other hand, "the 'because of' formulation . . . withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Id.; accord, Allied Irish Banks*, 240 F.R.D. at 106.

Plaintiff attacks defendants' invocation of work-product protection, using an analogous argument to the one he used against their assertion of attorney-client privilege: since these internal investigations were undertaken for a business purpose (not a legal one), the documents created by the attorneys would have been created in substantially similar form regardless of any anticipated litigation, and do not fall within the ambit of work-product protection. Plaintiff urges us to find

that the documents in this case would have been created in essentially the same form regardless of the Zwirn Entities' concern about litigation, and hence that they are unprotected by work-product immunity. In doing so, he relies heavily on *Allied Irish Banks,* a case that dealt extensively with the "essentially similar form" inquiry.

In *Allied Irish Banks,* a rogue trader at Allfirst Bank, a subsidiary of Allied Irish Banks ("AIB"), created false records of transactions in order to disguise losses that he had incurred on legitimate trades. His scheme was ultimately responsible for nearly $700 million in losses. 240 F.R.D. at 99. Once the trader's fraud was discovered, both the Central Bank of Ireland and the Federal Reserve announced that they were investigating it, and the FBI began a criminal investigation. *Id.* at 100. AIB also began an internal investigation headed by Eugene Ludwig, a former Comptroller of the United States Currency, and the bank announced publicly that it would release the results in thirty days. *Id.* Ludwig's consulting firm was assisted in its investigation by the law firm Wachtell, Lipton, Rosen & Katz. *Id.* Over the course of the investigation, approximately fifty-five present and former employees of AIB and Allfirst were interviewed; while AIB stated that Wachtell personnel attended the interviews, it did not claim that Wachtell personnel conducted any of the questioning. *Id.*

Ludwig's investigation ultimately produced a report (the "Ludwig Report") to the AIB Board of Directors. The Board released the Ludwig Report the following day, and filed it with the SEC as part of Allfirst's Form 8–K. *Id.* at 101. AIB ultimately sued Bank of America for claims arising out of the trading scheme, *id.* at 99, and Bank of America sought production of the documents created or reviewed in the course of preparing the Ludwig Report, including notes of witness interviews. *Id.* at 102. Bank of America limited its request to "the 'factual documents generated during the investigation,' and thus exclude[d] 'any legal analysis undertaken by Promontory [Ludwig's consulting firm] or Wachtell.'" *Id.* (quoting Bank of America Reply Mem. of Law at 5). AIB opposed

production of the documents, claiming attorney-client privilege and work-product protection.

In discussing whether the documents sought by Bank of America were protected by the work-product doctrine, the Court in *Allied Irish Banks* assumed that AIB had a reasonable belief that litigation would ensue, but stated that "the question under *Adlman* . . . is not merely whether AIB contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'" *Id.* at 106 (quoting *Adlman,* 134 F.3d at 1204). It then found that "the circumstances surrounding the creation of the [Ludwig] Report point to the ineluctable conclusion that AIB would have prepared the [Ludwig] Report, along with the materials used to generate it, simply because of its 'business-related purposes'— that is, regardless of the potential for litigation." *Id.* at 107. The business-related purposes underlying the report included (1) the need to reassure the public, as evidenced by AIB's desire to have the Ludwig Report completed and disseminated as quickly as possible, (2) the need to improve AIB's internal policies and controls to ensure that similar frauds would not recur, and (3) AIB's need to determine who was responsible for allowing the fraud to go unnoticed, and hold them accountable. *Id.* at 107–08. The actions AIB took in furtherance of these purposes—including announcing the investigation in advance and publicizing the Ludwig Report, revising its internal policies, and publicly firing six individuals identified as directly responsible for supervising the trader who had perpetrated the fraud—"evidence[d] the importance of the role of the Ludwig investigation as a corporate management tool, not as a mechanism to assist in expected litigation." *Id.* at 108.

There are obvious parallels between the events of this case and the events of *Allied Irish Banks.* Both cases involved corporations hiring outside firms to investigate financial irregularities. There are also Clear differences between the two cases. For example, neither the SRZ nor GDC investigations were announced in advance—unlike the

Ludwig investigation in *Allied Irish Banks*—nor was the dissemination of the findings of the investigations in this case as widespread or public as the dissemination of the Ludwig Report. But we believe that the dispositive distinction is between the types of documents sought in the two cases. The documents sought in *Allied Irish Banks* were limited to the factual matters encompassed within the interview notes compiled by the Ludwig investigation, in interviews that were not conducted by attorneys. *See* 240 F.R.D. at 102.[6] Moreover, Bank of America's request specifically excluded any legal analysis. *Id.* In fact, the court in that case noted that "if AIB could point to any particular documents authored by Wachtell that were 'specifically directed to litigation strategy or possible litigation defenses[,] under *Adlman,* these [documents] would fall within work product protection, because they would not have been produced in the same form irrespective of the threat of litigation.'" 240 F.R.D. at 109 (quoting *United States Fidelity & Guaranty Co. v. Braspetro Oil Servs. Co.,* 2000 WL 744369, at *9 (S.D.N.Y. June 4, 2000)). Here, plaintiff seeks the notes and summaries of witness interviews conducted by attorneys at two law firms, each of which was certainly aware of the possibility of litigation when asked to investigate accounting irregularities in the securities arena.[7] This distinction is a crucial one.

The cases dealing with the "essentially similar form" inquiry deal primarily with documents containing factual statements. *See Allied Irish Banks,* 240 F.R.D. at 106–07 (listing cases). The "essentially similar form" inquiry is less useful—and, we believe, inappropriate—when applied to the notes and summaries of interviews created by attorneys during their investigation, which we believe are likely to reflect the attorney's thought processes as to which statements by a witness were particularly relevant. *See In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002,* 318 F.3d 379, 384–85 (2d Cir.2003) (discussing an exception to the "essentially similar form" rule that "applies when an attorney has so specifically selected and compiled such documents in anticipation of litigation that production would necessarily reveal the attorney's developing strategy."). Applying the "essentially similar form" rubric to an attorney's notes and summaries of witness interviews would, we believe, directly conflict with the Federal Rules' admonition that we "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. Pro. 26(b)(3)(B). The Supreme Court has cautioned that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Upjohn,* 449 U.S. at 399, 101 S.Ct. 677 (citing *Hickman,* 329 U.S. at 513, 67 S.Ct. 385).

In fact, it seems that the only way to draw a distinction between interview notes created in anticipation of litigation and interview notes created for a business purpose would be to examine whether the attorney's notes reveal some focus on litigation strategy, and an attorney's mental processes on that score are precisely what the Supreme Court in *Upjohn* and *Hickman* sought to protect from discovery. Hence we find that, insofar as the interview notes and summaries contain opinion work product, they are protected by the work-product privilege.

Where the notes and summaries show only factual matters, defendants have

6. In *Allied Irish Banks,* the unprivileged factual documents included interview notes and memoranda, but, as the court noted, although "Wachtell personnel 'attended' the witness interviews" AIB "d[id] not state that Wachtell personnel conducted any of the questioning." 240 F.R.D. at 101.

7. Even if it could be said that SRZ's investigation—and the notes and summaries of interviews conducted in it—was not prepared with an eye towards possible litigation, it is clear that GDC was retained specifically to deal with a potential SEC investigation and enforcement action, given that the Zwirn Entities retained GDC, Deloitte, and Fried Frank less than two weeks before self-reporting the irregularities to the SEC. (O'Brien Decl. at Exs. C, H). This is sufficient to satisfy the "prepared in anticipation of litigation" requirement of Rule 26. *See In re Cardinal Health, Inc. Sec. Litig.,* 2007 WL 495150, at *5 (S.D.N.Y. 2007).

130

not shown that they would have been created in essentially similar form irrespective of the litigation, and so they are not protected work product. *See Abdell v. City of New York*, 2006 WL 2664313, at *6–7 (S.D.N.Y. Sept. 14, 2006) ("[L]ower courts have consistently treated witness statements as factual rather than opinion work product, even where those statements have been summarized by counsel.") (citing cases). We note, however, that the factual matters within the notes and summaries are, as stated above, protected by the attorney-client privilege. *See supra* p. 125; *cf. Upjohn*, 449 U.S. at 401, 101 S.Ct. 677 ("The notes and memoranda sought ... here ... are work product based on oral statements. If they reveal communications, they are, in this case, protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications.").

■ Even if documents fall within the scope of the work-product doctrine, they may still be discoverable if the party seeking their production establishes "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R. Civ. P. 26(b)(3)(A)(ii); *see also, e.g., Securities & Exchange Comm'n v. Vitesse Semiconductor Corp.*, 771 F.Supp.2d 310, 314 (S.D.N.Y.2011) ("To demonstrate substantial need, a party must demonstrate an inability to obtain equivalent evidence without undue hardship.") (citing Fed. R. Civ. Pro. 26(b)(3)); *Kidder*, 168 F.R.D. at 462. The "substantial need" standard, however, only applies to fact work-product; opinion work product "is to be protected unless a highly persuasive showing [of need] is made." *In re Grand Jury Proceedings*, 219 F.3d 175, 190–191 (2d Cir.2000) (quoting, *inter alia, Adlman*, 134 F.3d at 1204); *see also Upjohn*, 449 U.S. at 401–02, 101 S.Ct. 677 ("As Rule 26 and *Hickman* make clear, [opinion] work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.").

Plaintiff argues that he has shown "substantial need" for the notes and summaries, basing his argument entirely on the fact that

a significant amount of time—now nearly five years—has passed since the salient events took place, and that witnesses' memories of those events will naturally have faded. Defendant argues that this is insufficient to show substantial need, particularly since plaintiff has not even attempted to discover the information contained in the notes and summaries through alternative means.

At least one case in this District has found substantial need based on little more than the passage of time since the events at issue. In *Vitesse Semiconductor Corp.*, the SEC sued a corporation and several individual defendants, alleging "fraudulent revenue recognition practices and stock options backdating misconduct." 771 F.Supp.2d at 312. During the SEC's initial investigation of Vitesse, a non-party corporation conducted an internal investigation into its relationship with Vitesse, and produced the final report of that investigation to the SEC. *Id.* Two of the individual defendants subpoenaed the law firm and forensic accounting firm that had conducted the investigation, seeking not only the final report but also all documents connected to it. *Id.* at 312–14. Ultimately, the court found that the non-party corporation had waived any work-product protection for its report and its underlying documents by disclosing the report to the SEC, *id.* at 312–14, but the court went on to state that, even in the absence of waiver, defendants had shown substantial need for the report. This substantial need was based entirely on the length of time that had passed since the witnesses' initial interviews and the court's concern that "depositions of witnesses 'cannot reveal the same detail' as interviews conducted 'when the witnesses' memories were fresh,'" potentially rendering "defendants' ability to impeach witnesses at trial ... severely compromised, especially since the SEC may use the fruits of the report at trial ...." *Id.* at 314 (quoting, *inter alia, Granite Partners v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 56 (S.D.N.Y.1999)).

On the other hand, the Court in *In re Natural Gas Commodities Litig.* found that the plaintiffs had failed to show substantial need for interview memoranda from an internal investigation, "as [they] have not demon-

strated why they would not be able to depose the individuals interviewed during the internal investigation." 232 F.R.D. 208, 213 (S.D.N.Y.2005). That case dealt with allegations of manipulation of the natural gas futures market in the years 2000–2002. *See In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 500–01 (S.D.N.Y.2004). One of the defendants conducted an internal investigation of the practices allegedly showing market manipulation, basing their analysis on "data ... reflecting monthly trade-by-trade price and volume information for each [natural gas] trading hub" and "data for all trades made by [that defendant]"; another defendant conducted a similar internal investigation using similar sets of data. *In re Natural Gas Commodity Litig.*, 2005 WL 1457666, at *1–2 (S.D.N.Y. June 21, 2005). The analyses created in the course of these investigations were turned over to various governmental agencies, and plaintiffs sought to compel production of those analyses and the underlying documents, arguing that production to the government agencies constituted waiver and that they had substantial need for the factual material contained in the documents. *Id.* at *3–*4. In that case, however, "[t]he [work product] analyses ... were not based on oral information but documents, and those underlying documents have been produced to plaintiffs." *Id.* at *8. Hence, the court found that "[p]laintiffs d[id] not have a substantial need for the analyses that defendants' counsel and experts provided to the government." *Id.* at *8.

■ Regardless of whether the passage of time alone can show need substantial enough to warrant the disclosure of fact work product—a debatable proposition—our research has not unearthed a case where the passage of time has sufficed to make the "highly persuasive showing" required to defeat work-product protection for opinion work product. Hence we believe that plaintiff has not given us sufficient reason to allow discovery of the opinion work product contained in the interview notes and summaries sought on this motion. Even if we agreed that plaintiff's concern about fading memories is sufficient to overcome Rule 26's protection for factual work product, that holding would be limited to the factual material con-

tained within the documents sought on this motion. Since any factual material contained in the interview notes and summaries at issue in this case is protected by the attorney-client privilege, plaintiff's showing of substantial need as to those portions of the interview notes and summaries is ultimately irrelevant. Hence we turn to the issue of waiver.

## D. *Waiver*

■ The party claiming either attorney-client privilege or work-product immunity also bears the burden of establishing that the privilege has not been waived. *See, e.g., Allied Irish Banks*, 240 F.R.D. at 103 (attorney-client privilege), 105 (work-product immunity). We begin by noting that defendants have already produced to plaintiff certain documents created in the course of the internal investigations by SRZ and GDC, including the "talking points" produced by SRZ and used by Zwirn in his October 2006 calls to investors in the Zwirn Funds, and the Powerpoint slides used by GDC attorneys to give a presentation to the SEC about the irregularities at the Zwirn Funds. (O'Brien Decl. at ¶¶ 3–4, 6–9). Defendants have, of course, waived any applicable privilege in these documents by voluntarily disclosing them to plaintiff, although they are not the subject of the current motion. *Vitesse Semiconductor Corp.*, 771 F.Supp.2d at 313 (citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir.1993)) ("[I]f a party discloses work product materials to an adversary, the privilege is deemed waived."); *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y.2009) ("It is well-settled that the 'voluntary disclosure of confidential material to a third party waives any applicable attorney-client privilege.' ") (quoting *Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 214–15 (S.D.N.Y.2009)).

Plaintiff asserts several reasons why, in his view, defendants have also waived the applicable privileges in the interview notes and summaries prepared in the course of the SRZ and GDC investigations. We briefly summarize plaintiff's contentions about waiver (and defendants' responses), then state the relevant legal standards and apply them.

### 1. *Plaintiff's Contentions and Defendants' Response*

Plaintiff contends that defendants have waived any applicable privilege in the interview notes and summaries through their actions. Specifically, plaintiff points to three ways in which defendants have assertedly waived the attorney-client privilege and work-product protection: first, plaintiff asserts that defendants' disclosure of the investigations' findings to investors and the SEC—and defendants' reference to those findings in their pleadings—waived protection for those findings (Pl.'s Mem. of Law at 13); second, plaintiff contends that, since defendants have relied on the findings of the investigations in asserting certain affirmative defenses and counterclaims, fairness requires the disclosure of any documents underlying those findings so that plaintiff may adequately rebut defendants' contentions (*id.* at 13–16); and third, plaintiff asserts that defendants' "selective use of privileged materials" (*id.* at 16), *i.e.,* quoting certain portions of the interview notes and summaries in their disclosures to the SEC and revealing only portions of the investigations' findings to investors in the Zwirn Funds, waived any applicable privilege in the remaining portions of those materials. (*Id.* at 16–20).

Defendants contend that none of the cited actions constitutes waiver. As to their assertion of affirmative defenses to plaintiff's defamation claim, defendants state that they rely on the conclusions of the investigations solely to show that the disclosures were privileged under New York defamation law, rather than asking the court to rule on issues of fact based on the investigations' findings. (Defs.' Mem. of Law at 11–12; Tr. of Dec. 22, 2010 Conf. at 16–17). Similarly, defendants state that they do not rely directly on the findings of the investigations to press their counterclaims. Rather, they intend to prove the facts underlying their counterclaims through other evidence, such as statements from witnesses, including plaintiff himself. (*Id.* at 13; *see also* Tr. of Dec. 22, 2010 Conf. at 16–17, 27; Gruss Depo. at 94:12–24; 126:20–127:6; 257:13–18). They also point out that reliance on these facts does not waive the privilege as to the attorney-client communications

through which the law firms conducting an internal investigation learned those facts. (Defs.' Mem. of Law at 13–14 (citing, *inter alia, Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677; *Deutsche Bank Trust Co. of Americas v. Tri–Links Investment Trust,* 43 A.D.3d 56, 64, 837 N.Y.S.2d 15, 23 (1st Dep't 2007))).

Defendants respond in several ways to plaintiff's contentions that their disclosure or selective use of privileged material constitutes waiver. First, as to defendants' statements to investors, defendants point out that, to the extent that those statements contained only selective portions of the findings of SRZ's investigation (to wit, they did not reveal the investigation's findings about Kahn), the full findings of the SRZ investigation have been produced to plaintiff and this argument is therefore irrelevant. (Defs.' Mem. of Law at 17–18). Second, as to defendants' statements to the SEC, which included selected quotes from witness interviews, defendants contend that (1) those disclosures were made pursuant to a confidentiality agreement, and that agreement prevents waiver; and (2) that if the disclosure of those selected quotes operates as a waiver, the disclosure was made in an extrajudicial context, and hence any waiver applies only to the quotes already disclosed and not to the full interview notes and summaries. (*Id.* at 18–20). Defendants also point out that a reference in a party's pleadings to facts discussed in privileged communications does not waive the privilege in those communications. (*Id.* at 14).

We first address the parties' contentions regarding an "at issue" waiver and defendants' "selective use" of privileged materials, and then address whether the Zwirn Entities' disclosures constituted a waiver as to the interview notes and summaries.

### 2. *"At Issue" Waiver*

"[T]he attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991) (citing, *inter alia, In re von Bulow,* 828 F.2d 94, 103 (2d Cir.1987)). Hence "[a] privilege may be impliedly waived where a party makes assertions in the litigation or 'asserts a claim that in fairness requires examination of protected communica-

tions.'" *Granite Partners v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 55 (S.D.N.Y.1999) (quoting *Bilzerian*, 926 F.2d at 1292). This type of waiver—often referred to as an "at-issue" waiver, *see, e.g., Deutsche Bank Trust Co. of Americas v. Tri–Links Investment Trust*, 43 A.D.3d 56, 64, 837 N.Y.S.2d 15, 23 (1st Dep't 2007), or an "implied waiver" or "forfeiture", *See John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir.2003) (citing cases)—"typically occurs when the party asserting the privilege placed a protected document in issue through some affirmative act intended to inure to that party's benefit or where the party makes selective use of the privileged materials."[8] *Granite Partners*, 184 F.R.D. at 55; *accord, Deutsche Bank*, 43 A.D.3d at 63, 837 N.Y.S.2d at 23 ("'At issue' waiver of the privilege occurs where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information.") (citing cases). "The crucial issue is ... the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion." *John Doe Co.*, 350 F.3d at 306. "Whether fairness requires disclosure has been decided ... on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Proceedings*, 219 F.3d at 183.

■ The Second Circuit recently re-examined the principles underlying this type of waiver, and restricted the test previously adopted by many federal courts based on principles outlined in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975). *See generally In re County of Erie*, 546 F.3d 222, 226–29 (2d Cir.2008). In *Erie*, the Second Circuit stated that it is insufficient for a party merely to "mak[e] privileged material relevant to the case" by "plead[ing] a claim or affirma-

tive defense." 546 F.3d at 229 (quoting *Hearn*, 68 F.R.D. at 581) (internal quotation marks omitted). Instead, "the essential element" in finding an at-issue waiver is "reliance on privileged advice in the assertion of the claim or defense"; in other words, "a party must *rely* on privileged advice from his counsel to make his claim or defense" before a waiver will be found. *Id.* (emphasis in original).

The Court in *Erie* explicitly "decline[d] to specify or speculate as to what degree of reliance is required" for waiver since it ultimately found that petitioners had relied entirely on a qualified immunity defense, which rendered "any legal advice ... by [counsel] irrelevant to [petitioners'] defense." *Id.* Hence, the Court held, since disclosure of petitioners' communications with counsel would not prejudice respondents' case in any way, petitioners had not created any unfairness in the litigation and had not placed the privileged communications "at issue" by invoking qualified immunity, so as to create any waiver. *See id.* (quoting, *inter alia, Doe*, 350 F.3d at 305–06). The Court noted, however, that the petitioners in that case "[did] not claim a good faith or state of mind defense." *Id.* This distinction suggests that invocation of such a defense could potentially imply reliance on the advice of counsel, which could create an at-issue waiver. *See also id.* at 228–29 (citing, *inter alia, Bilzerian*, 926 F.2d at 1293 ("Accordingly, the assertion of a good-faith defense involves an inquiry into state of mind, which typically calls forth the possibility of implied waiver of the attorney-client privilege.")).

■ We are mindful, however, of New York precedent stating that at-issue waiver will be found only when a defense requiring reliance on the advice of counsel is itself to be proven by the use of privileged documents. In *Deutsche Bank*, the First Department discussed this rule, stating that the fact "that a privileged communication contains information relevant to issues the parties are litigating does not, without more, place the contents of the privileged communication itself 'at issue' in the lawsuit; if that were the

---

**8.** This type of waiver may also occur with respect to work-product immunity. *John Doe Co.*, 350

F.3d at 302 (quoting 6 Moore's Federal Practice 26.70[6][c] at 26–226 (3d ed. 1997)).

case, a privilege would have little effect." *Deutsche Bank,* 43 A.D.3d at 64, 837 N.Y.S.2d at 23. "Rather, 'at issue' waiver occurs 'when the party has asserted a claim or defense that he intends to prove *by use of the privileged materials.*'" *Id.* at 64, 837 N.Y.S.2d at 23 (emphasis added) (quoting *North River Ins. Co. v. Columbia Cas. Co.,* 1995 WL 5792, at *6 (S.D.N.Y. Jan. 5, 1995)); *accord, Aristocrat Leisure Limited v. Deutsche Bank Trust Co. Americas,* 727 F.Supp.2d 256, 274 (S.D.N.Y.2010) (quoting *United States v. Ghailani,* 751 F.Supp.2d 498, 501 (S.D.N.Y.2010)). We will therefore apply the New York standard for at-issue waiver to defendants' claim of attorney-client privilege, and the *Erie* standard to their claim of work-product immunity.

Here, defendants have asserted two good-faith defenses to plaintiff's defamation claim. (Answer at ¶¶ 257–58). They have also asserted counterclaims alleging breach of fiduciary duty and breach of contract stemming from plaintiff's alleged misconduct relating to the accounting irregularities at the Zwirn Entities. (*Id.* at ¶¶ 281–301). We examine whether any of these assert ions requires reliance on the advice of counsel (or the use of privileged materials as proof) sufficient to constitute a waiver of the attorney-client privilege or work-product protection.

### A. *Defendants' "Good–Faith" Defenses*

#### 1. *Chapadeau*

■ Defendants assert that plaintiff's defamation claims are barred because the allegedly defamatory statements are within the sphere of legitimate public concern and, in making the alleged statements, the [Zwirn Entities] acted reasonably, in good faith, and in reliance on the conclusions reached as a result of the review conducted by outside counsel [SRZ] and the independent internal investigation conducted by [GDC].

(Answer at ¶ 257). We understand this defense to assert that the *Chapadeau* standard applies to (and bars) plaintiff's defamation claims. *Cf. Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 100–02 (2d Cir.2000) ((discussing *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975)); *see also* Defs.' Mem. of Law at 13). Under this standard,

> where the content of the [allegedly defamatory statement] is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Chapadeau,* 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d 569. *Chapadeau* itself dealt with a media defendant, but "[c]ourts applying New York law have … uniformly applied *Chapadeau* to cases involving non-media defendants, at least where the communication at issue admits of measurement by the *Chapadeau* standard." *Konikoff,* 234 F.3d at 101 (citing *McGill v. Parker,* 179 A.D.2d 98, 108, 582 N.Y.S.2d 91, 97 (1st Dep't 1992)) & 102 n. 8 (collecting similar cases). Moreover, the *Chapadeau* standard has been applied in several cases with circumstances quite similar to those at issue here. *See Konikoff,* 234 F.3d at 103–04 (discussing cases). For example, in *Konikoff,* the Second Circuit applied the *Chapadeau* standard to the defamation claims of a former "real estate appraiser for the firm of KPMG Peat Marwick." 234 F.3d at 94. The plaintiff was mentioned, albeit not by name, in the report of Sonnenschein Nath & Rosenthal ("Sonnenschein"), a law firm hired by Prudential "to perform independent investigations of [two real-estate funds]' valuation practices." *Id.* at 95. After institutional investors threatened to withdraw from the real-estate funds due to a whistleblower's allegations that the funds' properties were overvalued, Prudential distributed Sonnenschein's report not only to the concerned investors, but also to "prospective investors, independent appraisers, and members of the media including *The New York Times, The Wall Street Journal, The Star–Ledger* (Newark, N.J.), and *Pensions and Investments.*" *Id.* (italics in original). Prudential also held

an investor meeting where investors in the real-estate funds were permitted to ask questions of the Sonnenschein partner in charge of the investigation, and published the transcript of the question-and-answer session. Konikoff challenged not only the statements made about her in Sonnenschein's report,[9] but also a statement made by the Sonnenschein partner in response to a question at the investor meeting. *Id.* at 96. Ultimately, the Second Circuit held that *Chapadeau* applied, that Prudential had acted responsibly in commissioning the report and was not grossly irresponsible in disseminating it, and that Prudential's statements were therefore privileged. 234 F.3d at 102–03, 105–06.

In *Konikoff,* the Second Circuit also analyzed several other cases involving the dissemination of statements following internal investigations into alleged wrongdoing, each of which applied the *Chapadeau* standard. *Id.* at 103–04. Most pertinently, it discussed *Luisi v. JWT Group, Inc.,* N.Y.L.J., Sept. 18, 1987, at 7, col. 3, 14 Media L. Rep. (BNA) 1732 (N.Y.Sup.1987), *aff'd w/o opinion,* 138 A.D.2d 987, 525 N.Y.S.2d 454 (1988), *appeal denied,* 72 N.Y.2d 803, 532 N.Y.S.2d 368 (1988), in which "the defendant advertising agency retained an external accounting firm to help investigate allegedly improper accounting practices by the plaintiff[.]" *Konikoff,* 234 F.3d at 104. "When the investigation was concluded, the defendant [in *Luisi*] issued a press release stating that the plaintiff was responsible for 'improper activities' that contributed to a $30 million loss in revenues." *Id.* (quoting *Luisi,* 14 Media L. Rep. at 1733). The court in *Luisi* applied *Chapadeau* and granted summary judgment for the defendant, "not[ing] that the statements were made solely in reliance on the outside investigators' report and that the report was prepared with due care and thoroughness." *Id.* (quoting *Luisi,* 14 Media L. Rep. at 1734).

These cases persuade us that defendants have a potentially viable *Chapadeau* defense. Moreover, we understand defendants' asserted defense that their allegedly defamatory

statements were "within the sphere of legitimate public concern" and were made "reasonably, in good faith, and in reliance on the conclusions" of their counsel (Answer at ¶ 257) to allege that they did not, in the words of *Chapadeau,* "act[ ] in a grossly irresponsible manner." 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d 569. At bottom, this defense asserts reliance on the advice of counsel, specifically, upon the talking points prepared for Zwirn's use, the internal reports detailing Gruss's involvement in the accounting irregularities, and the investor memorandum prepared by GDC. The defense therefore places the validity of that reliance at issue, and operates as a waiver of privilege as to those materials. *See Erie,* 546 F.3d at 229.

Defendants have, of course, already disclosed those materials, and so the existence of an additional waiver of privilege as to them is a moot point. On this motion, plaintiff seeks the interview notes and summaries used by SRZ and GDC in preparing the documents upon which defendants rely for their *Chapadeau* defense. Our analysis as to the interview notes and summaries is somewhat different.

■ Adequate evaluation of the *Chapadeau* defense does not require an examination of the interview notes and summaries made in the course of outside counsel's internal investigation. As stated in *Konikoff,* "the question is not whether the defendant knew or was aware of the probability that some statement in [the investigator's report] was false, but whether the defendant acted responsibly in selecting and interacting with the investigator and disseminating the results as a whole." 234 F.3d at 105. In *Konikoff,* the Court of Appeals applied this standard to the situation where "a defendant *publishes in its entirety* a report prepared by an outside investigator examining allegations of the defendant's wrongdoing in order to inform government agencies and the public of the investigator's conclusions[.]" 234 F.3d at 105 (emphasis added). Plaintiff's primary complaint about the Zwirn Entities'

---

9. Sonnenschein's report contained several quotations from witness interviews, including statements from the plaintiff in *Konikoff. See general-*ly *Konikoff v. Prudential Ins. Co. of Am.,* 1999 WL 688460, at *4–*7 (S.D.N.Y.1999).

publication of SRZ's findings is that it was incomplete, that is, it did not disclose that SRZ had found that Kahn was willfully blind regarding the accounting irregularities that ostensibly led to Gruss's firing. (*See, e.g.*, Pl.'s Mem. of Law at 3; O'Brien Decl. at Ex. B). While it is possible that this fact will have some effect on the court's eventual decision on the validity of the *Chapadeau* defense—in other words, it may be that defendants were "grossly irresponsible" in failing to disclose SRZ's findings in their entirety—we do not believe that it bears any relevance to the issue of waiver. Defendants have not, by asserting a *Chapadeau* defense, placed the content of the SRZ or GDC attorneys' interview notes and summaries at issue.

Specifically, it appears that defendants did not rely on the notes and summaries in making their allegedly defamatory statements. Defendants have submitted sworn declarations from three former executives at the Zwirn Entities—Daniel Zwirn, the former CEO, and David Lee and Lawrence Cutler, the two executives who oversaw the internal investigations [10]—who were the executives most closely involved in the investigations and the allegedly defamatory statements made in their wake. Each of these executives states that he has never seen the interview notes and summaries currently sought by plaintiff. (Zwirn Decl. at ¶¶ 6–7, 18–19; Cutler Decl. At ¶¶ 8–9, 22–23; Lee Decl. at ¶¶ 7–8, 20–21). Absent any evidence that would undercut these representations, we find no reason to believe that defendants relied on the interview notes and summaries, rather than on the documents that have already been disclosed. Without that reliance, there is no waiver. *See Erie*, 546 F.3d at 229; *accord Deutsche Bank*, 43 A.D.3d at 64, 67–69, 837 N.Y.S.2d at 23, 26–27.

Our conclusion on this point is not changed by the fact that Cutler sat in on some of SRZ's interviews during their investigation. (Cutler Decl. at ¶¶ 1, 8). Cut-

ler was the "principal point of contact for SRZ in connection with its investigation." (*Id.* at ¶ 8). His efforts to monitor the on-going investigation are more readily seen as evidence that the Zwirn Entities were "responsible in ... interacting with the investigator," *Konikoff*, 234 F.3d at 105, rather than a suggestion that the Zwirn Entities relied on some as-yet unspecified information allegedly revealed in the interviews and yet withheld from the documents already produced to plaintiff, particularly where defendant Zwirn has submitted a sworn declaration stating that, in making the allegedly defamatory statements following the SRZ investigation, he relied on talking points prepared by SRZ, rather than on any other information. (Zwirn Decl. at ¶¶ 11, 13). Plaintiff has given us no reason to question this sworn statement.[11]

### 2. Qualified Privilege

Defendants also assert a second good-faith defense, that "the allegedly defamatory statements were privileged under the self-interest and common interest privileges, and the [defendants'] actions ... were undertaken in good faith, with the absence of malicious intent to harm Gruss ...." (Answer at ¶ 258). We take this as an assertion of qualified privilege, and examine whether this defense asserts reliance on the advice of counsel in a way that would waive privilege as to the interview notes and summaries.

 "One of the defenses to defamation under New York Law is 'qualified privilege.'" *Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, 2003 WL 1193726, at *15 (S.D.N.Y. 2003) (quoting *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir.2001)). Among the available qualified privileges under New York law are the self-interest and the common-interest privilege. *See Konikoff*, 234 F.3d at 98 (citing, *inter alia, British Am. & E. Co. v. Wirth Ltd.*, 592 F.2d 75, 81 (2d

---

10. While Cutler was primarily responsible for both investigations (*see* Cutler Decl. at ¶¶ 8, 20–22), Lee did not learn of the SRZ investigation until after Gruss's departure, when he was appointed acting CFO of the Zwirn entities. (Lee Decl. at ¶¶ 5–10). Lee then supervised the GDC investigation alongside Cutler. (*Id.* at ¶¶ 18–20).

11. Plaintiff will be permitted, in depositions still to be taken, to test any representations made by the various declarants in connection with this motion.

Cir.1979) (self-interest privilege); *Stillman v. Ford,* 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 897, 238 N.E.2d 304 (1968) (common-interest privilege)).

 Under the common-interest privilege, " 'defamatory communications made by one person to another upon a subject in which both have an interest' are afforded qualified protection." *Tomasino,* 2003 WL 1193726, at *15 (citing *Meloff,* 240 F.3d at 146; *Albert v. Loksen,* 239 F.3d 256, 272 (2d Cir.2001)). "Once this qualified privilege has been raised it 'creates a rebuttable presumption of good faith that may constitute a complete defense.' " *Id.* (quoting *Meloff,* 240 F.3d at 146). We have previously noted "the existence of a common-interest privilege between investors or shareholders and the corporations in which they invest." *Konikoff,* 1999 WL 688460, at *15 (quoting *Glantz v. Cook United, Inc.,* 499 F.Supp. 710, 716 (E.D.N.Y.1979)). Hence the common-interest privilege is at least potentially available as a defense to plaintiff's defamation claim.

 The self-interest privilege is "less developed" than the common interest privilege, *Konikoff,* 234 F.3d at 98, but applies to defamatory statements "made in circumstances inducing a 'correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.' " *Konikoff,* 1999 WL 688460, at *12 (quoting *Goldstein v. Cogswell,* 1992 WL 131723, at *22 (S.D.N.Y. June 1, 1992), and citing, *inter alia,* RESTATEMENT (2d) OF TORTS § 594, cmt. b (1976)). "Any lawful pecuniary interest of the publisher may suffice as a 'sufficiently important interest' … except an interest in competition for prospective advantage, such

as a businessman competing for customers by defaming a competitor." *Id.* (quoting and citing RESTATEMENT at § 594, cmts. f and g) (internal citation omitted). In *Konikoff,* we found that "a public airing of corporate intent to discover and root out internal wrongdoing is reasonably viewed as important to long-term corporate success and even survival … [t]his finding suffices to justify invocation of the qualified self-interest privilege." 1999 WL 688460 at *14, *aff'd on other grounds,* 234 F.3d at 100. Therefore, the self-interest privilege is also, at least potentially, available as a defense to plaintiff's defamation claim.

 "If a defamatory communication is conditionally privileged, the plaintiff may nonetheless prevail by establishing that it was published excessively, *i.e.,* that it was made to persons with an insufficient interest in it for it to warrant protection." *Konikoff,* 234 F.3d at 98 (citing *Stukuls v. State,* 42 N.Y.2d 272, 281, 397 N.Y.S.2d 740, 746, 366 N.E.2d 829 (1977)).[12] A plaintiff may also overcome a conditional privilege by showing "malice," either "of the common law or of the constitutional variety." *Id.* (emphasis omitted) (citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 437–38, 590 N.Y.S.2d 857, 862–63, 605 N.E.2d 344 (1992)). "Common law malice 'mean[s] spite or ill will,' … and will defeat the privilege only if it is 'the one and only cause for the publication.' " *Id.* at 98–99 (quoting *Liberman,* 80 N.Y.2d at 437, 439, 590 N.Y.S.2d at 862, 863, 605 N.E.2d 344). "Constitutional or 'actual' malice means publication 'with [a] high degree of awareness of [the publication's] probable falsity' or while 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.* at 99 (quoting *Liberman,* 80 N.Y.2d at 438, 590 N.Y.S.2d at 863, 605 N.E.2d 344).

**12.** Some courts also state that, in challenging an assertion of qualified privilege, a plaintiff must establish that the statement at issue was false. *See, e.g., Tomasino,* 2003 WL 1193726, at *15 (citing cases). This is, of course, an element of a successful defamation claim even absent assertion of a qualified-privilege defense, since "truth is an absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir.1986) (quoting *Commonwealth Motor Parts Ltd. v. Bank of Nova Scotia,* 44 A.D.2d 375, 378, 355 N.Y.S.2d 138, 141 (1st Dep't 1974); *see also Konikoff,* 234 F.3d at 98 n. 4). Substantial truth also defeats a charge of libel. *See Guccione,* 800 F.2d at 301 (quoting *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 297, 445 N.Y.S.2d 156, 159 (2d Dep't 1981)). " 'Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge is justified.' " *Tomasino,* 2003 WL 1193726, at *15 (quoting *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)).

**138**

"The critical difference between common-law malice and constitutional malice, then, is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." *Id.* (citing cases).[13]

▇▇▇ Neither of the qualified privileges asserted by the defendant requires reliance upon the advice of counsel. Instead, they require only that defendant either shares an interest in the subject with the recipient of the allegedly defamatory communication or that the recipient's knowledge of the allegedly defamatory matter serves a sufficiently important interest of the defendant. The interview notes and summaries could potentially be relevant to plaintiff's attempt to defeat the qualified privilege by asserting malice, although they would be irrelevant to the question of whether defendants' publication of the allegedly defamatory statements was excessive. But as *Erie* makes clear, relevance is not the appropriate inquiry on which to determine waiver. 546 F.3d at 227–29. Since invocation of the qualified-privilege defense does not require reliance upon the advice of counsel, we find that defendants have not waived any applicable privilege protecting the interview notes and summaries in asserting such a defense. *Cf. id.* at 229 (no waiver found based on assertion of defense of qualified immunity, since "reliance upon advice of counsel . . . cannot be used to support th[at] defense."). Moreover, plaintiff has not made any specific allegations to support his malice theory or to suggest that the only way to prove that theory would be through invasion of the privilege. The mere suggestion of malice, without more, cannot suffice to waive the privilege, since such a rule could lead to waiver in any case in which the state of mind of one of the parties was at issue and could be revealed by privileged communications. That is, of course, not the law of waiver. *Cf. Erie,* 546 F.3d at 229; *Deutsche Bank,* 43 A.D.3d at 67, 837 N.Y.S.2d at 25–26 ("[Defendant] does not suggest any specific grounds to suspect that [plaintiff] entered into the settlement in bad faith, or (assuming

grounds for such suspicion existed) to believe that invasion of the attorney-client privilege would be the only way to lay bare such bad faith. If the privilege could be deemed waived by nothing more than the theoretical possibility of an issue concerning the settlement's good faith . . ., a similar waiver would have to be implied in every case in which the bad faith of the plaintiff would constitute a defense. [Such a] result . . . is disfavored.").

### B. *Defendants' Counterclaims*

Plaintiff also asserts that defendants' reliance on the findings of the internal investigations in their asserted counterclaims constitutes a waiver of the privilege. Again, were this argument directed towards the talking points, internal reports, or investor memorandum that have already been disclosed to plaintiff, we would be inclined to agree that there could be a waiver. We are more skeptical, however, of this assertion as directed towards the interview notes and summaries created by the law firms in the course of their investigation.

▇▇▇ Plaintiff asserts that "[b]y expressly relying on what the [SRZ] and [GDC] investigations concluded, the Zwirn Entities have placed the accuracy of those findings at issue, thereby waiving the privilege concerning the underlying documents," including the interview notes and summaries. (Pl.'s Mem. of Law at 18–19 (citing *Granite Partners,* 184 F.R.D. at 55)). In fact, plaintiff cites to several paragraphs of defendants' Answer, in which defendants refer to the SRZ and GDC investigations (*id.* at 17–18), and he states that "[t]he Zwirn Defendants offer no other basis [besides the law firms' findings] for which they cast all blame on Gruss for the company's troubles." (*Id.* at 17). Even a cursory examination of defendants' Answer reveals this representation to be false. Defendants make extensive allegations as to specific instances of Gruss's misconduct, none of which rely solely on the findings of the internal investigations. (*See* Answer at ¶¶ 137–217). In any event, while it is true that the Zwirn Entities may have originally

---

**13.** In plaintiff's complaint he asserts that defendants acted with both common-law and constitutional malice. (*See* Compl. at ¶¶ 70–72, 80–82).

learned of some of these alleged facts through the internal investigations, their later reference to those facts does not waive the privilege in the communications whereby they gained that knowledge, any more than an assertion of privilege in a particular attorney-client communication protects against disclosure of the underlying facts by those who communicated with the attorney. *Cf. Upjohn*, 449 U.S. at 395–96, 101 S.Ct. 677; *accord, e.g., United States v. Walker*, 243 Fed.Appx. 621, 623 (2d Cir.2007); *Arista Records, LLC v. Lime Group LLC*, 784 F.Supp.2d 398, 415 (S.D.N.Y.2011); *In re Woolworth Corp. Secs. Class Action Litig.*, 1996 WL 306576, at \*2 (S.D.N.Y. June 7, 1996). As stated above, the privilege is not waived unless the party asserting its claim "intends to prove [the asserted claim or defense] by *use of the privileged materials.*" *Deutsche Bank*, 43 A.D.3d at 64, 837 N.Y.S.2d at 23 (emphasis added) (quoting *North River Ins. Co.*, 1995 WL 5792, at \*6).

Defendants have expressly disavowed any intent to use the privileged notes and summaries as proof of their claim, instead stating to the Court that they "are going to rely, and must rely, on the underlying conduct, the proof of the underlying conduct, the documents, and plaintiff's own admissions in depositions already, … to establish both … the affirmative defense to defamation and [the counterclaims] for the breach of fiduciary duty and breach of contract[.]" (Tr. of Dec. 22, 2010 Conf. at 17; *see also id.* at 32 ("In order to make out the breach of fiduciary duty and the breach of contract claims, we are going to have to prove the underlying conduct.")). Defendants also stated at oral argument, as an example of their intention to prove their claims without relying on privileged documents, that Mr. Gruss had admitted, in his deposition, that the statements in the investigative reports were correct. (*Id.* at 27). Defendants supplemented the record after oral argument by providing a copy of plaintiff's deposition transcript and citations to certain portions of it. (*See* Letter to the Court from Alan Levine, Esq., dated Dec. 23, 2010). The cited portions of Gruss's deposition indeed support several of the allegations made in defendants' answer, although Gruss did not say in so many words that the reports were correct. For example, in defendants' Answer, they alleged that Gruss had authorized the payment of management fees from the Zwirn Funds before those fees were actually due. (Answer at ¶¶ 202–07). At his deposition, Gruss admitted that he had done so:

> "Q: And in fact, you knew, because you were copied [on emails] that management fees were paid early without authority?
>
> A: Yes.
>
> Q: And you approved that?
>
> A: Yes."

(Gruss Depo. at 257:13–18). Gruss also admitted that he understood that the early collection of management fees was a violation of the agreement between the Zwirn Funds and their management company (Gruss Depo. at 94:12–24), and that his job included a fiduciary duty to the investors in the Zwirn Funds to use their funds in accordance with those agreements. (Gruss Depo. at 126:20–127:6). Plaintiff has not attempted to show—nor could he show, in our opinion—that the interview notes and summaries he seeks are necessary to defendants' counterclaims or affirmative defenses. Hence defendants' mere assertion of the counterclaims does not create a waiver of the privilege in these documents. *Cf. Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 62 A.D.3d 581, 582, 880 N.Y.S.2d 617, 619 (1st Dep't 2009) (finding no waiver where "plaintiff disavows any intention to use [privileged] communications and defendant fails to show that any such communications are necessary to either plaintiff's claim or defense"); *Deutsche Bank*, 43 A.D.3d at 65, 837 N.Y.S.2d at 24 (finding no at-issue waiver where "[plaintiff] forthrightly states that it will not use privileged material or attorney work-product to establish the reasonableness of its defense …. Instead, [plaintiff] states that it will rely on evidence from the 120 boxes of non-privileged documents it has already produced to [defendant] in this action ….").

We therefore turn to plaintiff's alternative argument, that defendants' selective use of portions of the interview notes and summaries resulted in a waiver of the remainder of

those documents. Plaintiff's argument on this point overlaps to a substantial extent with his argument that defendants' disclosures to their investors and to the SEC destroyed the confidentiality necessary to maintain any claim of privilege in the underlying communications. Hence we will address both arguments together.

### C. *Waiver by Disclosure and "Selective Use"*

■ Plaintiff asserts that defendants waived any applicable privilege in the investigative reports (and the interview notes and summaries underlying them) in several ways. First, plaintiff asserts that simply by disclosing the existence of the investigations and the substance of their findings in their answer and counterclaims, defendants have waived the attorney-client privilege and work-product protection. (Pl.'s Mem. of Law at 13). The idea that simply referring to an attorney-client communication in a pleading waives the privilege is a staggeringly broad proposition. Unsurprisingly, plaintiff cites to no legal authority for this contention, and we have been unable to find any. We therefore reject it.

■ Plaintiff also asserts that defendants have waived any applicable privilege through their disclosures to the SEC and to investors and other stakeholders in the Zwirn Funds. (*Id.*). We find no more merit in these arguments.

When asked for legal authority to support the proposition that a disclosure of SRZ and GDC's conclusions to shareholders and other stakeholders waives protection for the underlying communications, plaintiff asserted that such disclosure destroyed the confidentiality necessary to the attorney-client privilege. (Tr. of Dec. 22, 2010 Conf. at 11–13). This is not the law. As stated above, the attorney-client privilege applies to communications, not facts; even if certain facts were once the subject of a privileged attorney-client communication, disclosure of those facts does not waive the privilege in the communication. *See supra* p. 139. If it did, the attorney-client privilege could be easily destroyed by the simple expedient of deposing the client about the facts of the case.

■ The attorney-client privilege and work-product immunity may be waived by selective disclosure of only part of a protected communication or document, since a party "may not rely on the protection of the privilege regarding damaging communications while disclosing other self-serving communications." *Deutsche Bank*, 43 A.D.3d at 64, 837 N.Y.S.2d at 15. Plaintiff asserts, as an alternative argument for waiver, that defendants selectively revealed portions of the SRZ investigation to investors, by failing to disclose SRZ's findings about Kahn (Pl.'s Mem. of Law at 19–20), and that GDC's disclosure of "witness statements" to the SEC constitutes selective use of the privileged communications found in those witnesses' interviews, waiving any privilege in the remainder of the communications. (*Id.* at 20).

■ With respect to defendants' alleged selective disclosure to their investors, first, we find that these disclosures dealt primarily with facts, not privileged communications, and the disclosure of facts does not waive the privilege. *See supra* p. 139. Second, where defendants disclosed privileged communications, "the extrajudicial disclosure of an attorney-client communication—one not subsequently used in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication." *In re von Bulow*, 828 F.2d at 102. "Matters actually disclosed in public lose their privileged status because they obviously are no longer confidential." *Id.* at 103. Even if the public disclosures are "one-sided" or "misleading," however, those disclosures "create no risk of *legal* prejudice until put at issue in the litigation by the privilege holder." *Id.* (emphasis in original); *see also Kidder Peabody*, 168 F.R.D. at 469. There can be little question that defendants' original disclosures to their investors occurred outside the judicial context. Moreover, defendants have disclosed to plaintiff the entirety of SRZ's findings, obviating any legal prejudice resulting from the selective disclosure. Hence we find that *von Bulow* controls, and defendants' selective disclosure of SRZ's findings to their investors did not result in a waiver of the undisclosed portions

of those findings or the interview notes and summaries underlying them. The same is true with respect to the disclosure of some or all of GDC's findings in the March 2007 Investor Memorandum.

Defendants' disclosures of certain "witness statements" to the SEC presents a more difficult question. At the outset, we discern two separate contentions within this argument by plaintiff for waiver: first, that the selective disclosure of portions of the interview notes and summaries, in the form of quotes from interviews presented to the SEC, waived any privilege in the undisclosed portions of the notes and summaries, at least insofar as that privilege might be asserted against the SEC itself; and second, that the waiver of privilege as to the SEC constitutes a waiver of the privilege as to other parties, specifically Gruss. We address each contention in turn.

Within the context of an SEC investigation, "a company's voluntary disclosure[ ] to the SEC is[,] by implication, a waiver of privilege with respect to the specific information necessary to confirm the disclosures," insofar as the confirmatory information is sought by the SEC itself. *SEC v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 143 (S.D.N.Y.2004) (citing, *inter alia, Kidder Peabody*, 168 F.R.D. at 472). This type of "selective disclosure" of materials raises the possibility that the disclosing party is only revealing the portions of privileged documents or communications that are favorable to its position. Hence, where a party discloses only portions of a privileged communication—and intends to rely on those disclosures to prove its claim or defense—fairness requires a waiver of privilege in the remainder of the communication, so as to allow the disclosing party's adversary an adequate opportunity to impeach its claim. *See John Doe Co.*, 350 F.3d at 303 ("it would be unfair to force the prosecutor to run the risk that the jury would accept the defendant's claims as to the facts the defendant put in issue while allowing the defendant, by assertion of his privileges, to deny the prosecutor access to directly pertinent material that might effectively impeach the defendant's claims.").

That leaves us with the question whether a waiver as against the SEC constitutes a waiver vis-a-vis other parties. The Second Circuit has found a waiver of privilege as to private litigants when the privilege was waived through voluntary disclosure to the SEC. *See In re Steinhardt Partners, LP*, 9 F.3d at 235–36. In *Steinhardt*, however, the Court of Appeals suggested that this rule might not apply when "the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials." *Id.* at 236. Subsequent cases have applied this dictum to preclude—or at least limit—a so-called "selective waiver" where the SEC and the disclosing party entered into a confidentiality agreement that reserves application of the privilege in subsequent proceedings. *Police and Fire Retirement Sys. of City of Detroit v. SafeNet, Inc.*, 2010 WL 935317, at *1 (S.D.N.Y.2010) (listing cases); *see also United States v. Wilson*, 493 F.Supp.2d 348, 362 (E.D.N.Y.2006) ("What I draw from . . . *Steinhardt* . . . is that a question of selective waiver must be decided on a case-by-case analysis, and that the existence of an express non-waiver agreement is a critical element of the analysis."); *In re Natural Gas Commodities Litig.*, 232 F.R.D. 208, 211 (S.D.N.Y.2005) ("[V]oluntary disclosure to government agencies pursuant to an explicit non-waiver agreement does not waive the . . . work product or attorney-client privilege.") (citing, *inter alia, In re Steinhardt Partners, L.P.*, 9 F.3d at 236).

The leading case to the contrary in this District is *In re Initial Pub. Offering Sec. Litig.* ("*In re IPO*"), 249 F.R.D. 457, 466 (S.D.N.Y.2008). In that case, Credit Suisse had hired outside counsel to conduct an internal inquiry into "alleged misconduct related to the allocation of shares during initial public offerings." *Id.* at 458. In the course of that investigation, Credit Suisse's counsel interviewed employees and created memoranda summarizing the facts learned in those interviews. *Id.* Credit Suisse later produced those memoranda to the SEC and the United States Attorney's Office for the Southern District of New York, as well as to three former Credit Suisse employees "who had

commenced an arbitration against Credit Suisse for wrongful discharge." *Id.* Credit Suisse also discussed the contents of some of the memoranda with officers of the National Association of Securities Dealers Regulation, Inc. ("NASDR"). *Id.* With the possible exception of the disclosure to NASDR, all of these disclosures were made pursuant to confidentiality agreements. *Id.* Nevertheless, the Court found that Credit Suisse's "repeated voluntary disclosures to adversarial parties" precluded a finding of selective waiver as to the most recent set of plaintiffs, who sought production of the memoranda. *Id.* at 466.

█ In this case, defendants' limited disclosures to the SEC were pursuant to an express confidentiality agreement, which reserved the application of the attorney-client and work-product privileges. (O'Brien Decl. at Ex. H). There is no indication that defendants have voluntarily disclosed part or all of the interview notes and summaries to any other actual or potential adversary. Nor is this a situation where—as in *In re IPO*—plaintiff seeks disclosure of the same materials already produced to other parties; instead, plaintiff seeks disclosure of additional documents underlying what was disclosed to the SEC. Given the existence of defendants' confidentiality agreement with the SEC and the absence of any other circumstances arguing in favor of a subsequent waiver, we do not believe that defendants' disclosures to the SEC resulted in a waiver of the privilege in the undisclosed portions of the interview notes and summaries as to plaintiff.

█ Finally, plaintiff asserts that defendants' production, in this case, of the "witness perspectives" shared with the SEC constitutes selective use, and thus waiver, of interview notes and summaries underlying those materials. (Pl.'s Reply Mem. at 10). We need not consider this argument, as it was raised for the first time on reply. *See, e.g., PrecisionIR Inc. v. Clepper,* 693 F.Supp.2d 286, 291 n. 2 (S.D.N.Y.2010) (quoting *United States v. Yousef,* 327 F.3d 56, 115 (2d Cir.2003)). Were we to do so, however, we would find that this disclosure does not qualify as the type of "selective use" requiring a general waiver of the underlying notes and summaries, since, as stated above, defendants do not purport to rely upon the witness statements (or indeed, any other aspect of the disclosed reports) to prove any claim or defense in this case. *See People ex rel. Cuomo v. Greenberg,* 63 A.D.3d 576, 577–78, 881 N.Y.S.2d 92, 94 (1st Dep't 2009) ("Waiver is predicated on the privilege holder's placing the selectively disclosed privileged communications at issue, . . . i.e., intending to prove an asserted claim or defense by use of the privileged materials.") (citing *American Re-Ins. Co. v. United States Fid. & Guar. Co.,* 40 A.D.3d 486, 492, 837 N.Y.S.2d 616, 622 (1st Dep't 2007)) (internal citation removed); *Deutsche Bank,* 43 A.D.3d at 64, 837 N.Y.S.2d at 23; *see also Aristocrat Leisure Limited,* 727 F.Supp.2d at 274 (quoting *Ghailani,* 751 F.Supp.2d at 501).

Hence none of plaintiff's arguments for waiver succeed, and we decline to compel production of the interview notes and summaries.

*CONCLUSION*

We have considered plaintiff's arguments and find them unavailing. The notes and summaries of interviews conducted by attorneys in the context of an internal corporate investigation are protected by the attorney-client privilege where they reflect the substance of communications between attorneys and corporate client-employees, and by the work-product doctrine where they reflect the attorneys' mental processes and were created because of pending or anticipated litigation. Defendants' actions have not placed the contents of the notes and summaries at issue by relying on them to prove a claim or defense, and thus have not waived the protection in the interview notes and summaries sought by plaintiff. Hence plaintiff's motion is denied.